577 So.2d 732 (1991)
Fred J. STOVALL
v.
SHELL OIL COMPANY, Herman Hebert and Allstate Insurance.
No. 89 CA 1870.
Court of Appeal of Louisiana, First Circuit.
March 7, 1991.
Rehearing Denied May 2, 1991.
*734 Allen J. Borne, Borne, Senette & Duplantis, Franklin, for plaintiff/appellant Fred Stovall.
Christopher H. Riviere, Porteous, Hainkel, Johnson & Sarpy, Thibodaux, for Allstate Ins. Co.
John E. Conery, Franklin, for Herman Hebert.
James E. Blazek, Adams & Reese, and Arthur A. Crais, Jr., New Orleans, for Shell Oil Co.
John H. Hughes, Allen & Gooch, Lafayette, for intervenors/appellants Frees Const. Co., North River Co. & U.S. Fire Ins. Co.
Charles Hanemann, Henderson, Hanemann & Morris, Houma, for Herman Hebert.
Before EDWARDS, WATKINS and LeBLANC, JJ.
WATKINS, Judge.
Plaintiff, Fred Stovall, was employed by Frees Construction Company (Frees) as a job supervisor. During the course and scope of his employment, Mr. Stovall was injured when a 750-pound steel pipe accidentally fell on his foot. The accident occurred when the pipe was pushed from several pipe jacks to the ground by Herman Hebert, a contract welder hired by Frees. The incident happened on the property of Shell Oil Company Co., which had contracted with Frees for the construction of a platform for a new condensation tank. The contract also called for connecting the tank to Shell's existing facilities. Because Frees did not have a welder as a regular employee, it hired Mr. Hebert and another welder, Mr. Glynn D. Ferrier, to perform the welding necessary to connect the tank.
*735 Plaintiff filed suit against Shell Oil Co. (Shell),[1] Herman Hebert and Allstate Insurance Company, Mr. Hebert's automobile insurer. United States Fire Insurance Company, the worker's compensation insurer for the plaintiff's employer, intervened for reimbursement of benefits paid to plaintiff.
Plaintiff grounded his claim against Shell on theories of strict liability, negligence, and vicarious liability. Plaintiff also alleged that Mr. Hebert, as an independent contractor, was liable for his negligence and that the accident was covered by Mr. Hebert's automobile insurance policy because Mr. Hebert was in the process of loading his vehicle when the accident occurred. The jury found no negligence on the part of Shell, and apportioned negligence to the remaining parties as follows: 10 percent for Mr. Hebert, 75 percent for Frees, and 15 percent for Mr. Stovall. The jury also found that Mr. Hebert was an employee of Frees and that the accident did not arise out of the loading or unloading of Mr. Hebert's vehicle. The jury awarded plaintiff $400,000.00 for his injury. Since the jury found Mr. Hebert to be an employee of Frees and a co-employee of plaintiff, both Mr. Hebert and Frees were immune from tort liability to the plaintiff. Accordingly, the trial judge dismissed all of plaintiff's claims.
The worker's compensation insurer joined plaintiff in perfecting this appeal. Appellants' assignments of error fall into two main categories: erroneous jury charges and manifest error in the jury's factual findings. Appellants urge that the trial court erred in not charging the jury on Shell's strict liability under LSA-C.C. art. 2317, in not charging the jury on Shell's own negligence under LSA-C.C. art. 2315, and in improperly charging the jury on statutory employment. Plaintiff also contends that the jury was manifestly erroneous in finding that Shell was not liable for the negligent acts of Mr. Hebert; in finding that plaintiff was 15 percent at fault; in finding that Mr. Hebert was a statutory employee of Frees; and in finding that at the time of the accident Mr. Hebert was not in the process of loading or unloading his vehicle, thereby precluding coverage by Mr. Hebert's insurance policy with Allstate.

FACTS
At the time of plaintiff's injury, Frees was a general contractor, doing primarily industrial plant construction.[2] In the course of this work it was occasionally necessary to have welding done, and as Frees did not have welding equipment or a welder in its employ, it engaged individual contract welders to render this service. The welders were paid by the hour for their equipment and services and were not provided any fringe benefits such as hospitalization or retirement. According to Charlie Heard, a Frees superintendent, the welders were responsible for paying their own taxes, as well as worker's compensation, and liability insurance.[3]
In 1984 Frees entered into a construction contract with Shell which primarily involved the in-plant construction of a platform for a condensation tank. Frees was to erect the foundation by driving pilings, erecting forms and pouring concrete. Another contractor hired by Shell, Chicago Bridge and Iron, would erect the tank and then Frees would connect the tank to Shell's existing systems. Shell designated the general work area for the construction project, and the contractors were required to confine their operations to that area. The construction area was a narrow strip of land surrounding the location of the condensation tank and was situated between a road and a line of trees, in an area which ranged in width from 30 to 50 feet. Although Shell designated the general work area, Frees had the responsibility and authority to set up their equipment and working areas as they chose, within the general area.
*736 Under the contract Shell reserved the right of inspection on the construction project; however, the contract specifically provided that Frees was obligated to maintain all direction and control over the manner in which the contracted work was performed. Frees was contractually responsible for initiating, maintaining and supervising all safety precautions and safety programs in connection with the contract work. Frees also agreed to have a person on site responsible for the prevention of accidents.
When Frees began construction in the latter part of 1984, Fred Stovall was appointed by Frees as the supervisor at the jobsite, and he maintained control over all aspects of Frees' portion of the contract work, including the work of the contract welders. Mr. George Keene was Shell's designated inspector for this particular project, and he was responsible for seeing that the project was built according to contract specifications. Mr. Keene testified that Shell supplied the condensation tank, as well as the internal pipe and fittings. However, Frees supplied the external interconnecting pipe. Mr. Keene also testified that he acted solely as an inspector and that he did not supervise the work of contractors or their employees.
The contract also made extensive provisions for welding work on the construction project. Frees could use only welders which were approved by Shell after a welding test at Frees' expense. The contract specified precisely what type of welding was to be performed on the project, and the welding could only be performed in areas designated by Shell after the area had been "sniffed" for gases and a "hot permit" issued by a Shell employee each day that welding was performed. Shell also required completed welds to be x-rayed.
Frees hired Mr. Hebert and Mr. Ferrier apparently because both of them had been approved previously by Shell. Each welder supplied his own welding equipment, but Frees supplied all the necessary pipe and fittings for the construction project. Frees also supplied a cherry picker on the construction site to be used, among other things, for the moving of the large pieces of pipe. The cherry picker was operated solely by regular Frees employees.
Prior to beginning work on the project, Mr. Hebert and Mr. Ferrier met with Mr. Stovall and Mr. Keene to review the project specifications. After this meeting, Mr. Hebert and Mr. Ferrier were able to proceed with their work according to the specifications. Mr. Stovall would inspect the welding for compliance with the specifications and would assist Mr. Hebert with field measurements that were not on the specifications. During the project Mr. Hebert and Mr. Ferrier were set up to work approximately 100 yards from the platform construction area, on a strip of land approximately 30 feet wide. The area was between a road and a line of trees; therefore, the only way to store long pieces of pipe was to place them parallel to the road. Prior to the accident, Frees' employees had placed several long pieces of pipe next to the road. The pipe on the ground was approximately three to five feet from a piece of pipe that was sitting on several pipe jacks ready to be welded.
On the morning of the accident Mr. Hebert arrived early in order to obtain his "hot permit" for the day's work. After he received the permit, he proceeded to the welding area and was confronted by Mr. Stovall, who informed him that because he was late starting work, he would be docked one-half hour. Mr. Hebert exchanged unpleasant words with Mr. Stovall, expressing his displeasure with Mr. Stovall and informing him that he could find another welder to complete the project. At this point Mr. Hebert and Mr. Ferrier began loading their equipment in their trucks. Shortly thereafter, Mr. Hebert went to retrieve several pipe jacks which held a 40-foot piece of pipe. Mr. Hebert pushed the pipe off of the jacks, unaware that Mr. Stovall had approached him from the rear and was standing behind him. When the pipe hit the ground, it bounced backwards, striking Mr. Stovall on the foot and ankle. Mr. Hebert was able to step out of harm's way, but Mr. Stovall was blocked from escape by the pipe which was situated on the ground. Mr. Stovall testified that he *737 knew Mr. Hebert was going after his pipe jacks and he attempted to stop Mr. Hebert from pushing the pipe off the jacks by yelling, "Don't shove the damn pipe." Mr. Hebert testified that he did not hear the warning before he pushed the pipe.
It was agreed by all witnesses that the preferred method for moving large pieces of pipe was with the cherry picker; however, the cherry picker had broken the afternoon before the accident and was not operational. Apparently the cherry picker broke frequently during this project and the welders either lifted pipe on and off the jacks or pushed the pipe off.

MR. HEBERT'S LIABILITY
Plaintiff contends that the jury's finding of co-employee status between the plaintiff and Mr. Hebert was erroneous for several reasons. Initially, the plaintiff contends that the jury was improperiy charged regarding the burden of proof on the affirmative defense of statutory employment, and further that the jury should not have been charged on the statutory employment defense because that defense may only be interposed by a principal/employer.
At trial Mr. Hebert alleged several theories of tort immunity based on his alleged status as a co-employee of the plaintiff. Mr. Hebert contended that he was either a direct employee, an employee pro hac vice, or a statutory employee. The trial court charged the jury on all the proposed theories, and the jury, without specifying the theory upon which it relied, concluded that Mr. Hebert was an employee of Frees.
We find that it was error for the trial court to instruct the jury on the theory of statutory employment. The Louisiana Supreme Court has held that a contractor's status as a statutory employee will not shield him from tort liability to a principal's employee. Johnson v. Alexander, 419 So.2d 451 (La.1982). See also Smith v. Cotton's Fleet Service, Inc., 500 So.2d 759 (La.1987); Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (La.1951); Lafont v. Chevron U.S.A., Inc., 545 So.2d 1308 (La. App. 1st Cir.1989). Malone & Johnson, 13 La. Civil Law Treatise (Workers' Compensation), § 78. The Johnson court concluded that:
[T]here is no provision in the statutory scheme which creates an employer-employee relationship between the subcontractor and the principal's employees. As a result, the subcontractor has no liability for compensation payments to injured employees of the principal. Without any obligation to pay benefits, the subcontractor has not participated in the mutual compromise contemplated by our workmen's compensation law and is not immune from suit in tort. See Wofford v. Dow Chemical Co., [335 So.2d 536 (La.App. 1st Cir.1976)]; Malone & Johnson, [Workers' Compensation] Sec. 368 in 14 Louisiana Civil Law Treatise.
Further, though workmen's compensation benefits are a statutory employee's exclusive remedy when injured by employees of the principal, there is no provision in our workmen's compensation act which grants immunity from suit to a "statutory co-employee" who injures the principal's employee during the course and scope of employment. Absent a statutory provision to the contrary, the employees of the subcontractor must be considered third persons as far as the employees of the principal are concerned and subject to proceedings in tort. Benoit v. Hunt Tool Co., [219 La. 380] 53 So.2d 137 (La.1951); Malone & Johnson, [Workers' Compensation], Sec. 368 in 14 Louisiana Civil Law Treatise. (Footnote omitted).
Johnson, 419 So.2d at 454.
The reasoning expressed in Johnson applies with equal force to the instant case where the alleged contractor himself is the target of the principal employee's tort suit. Of course, Mr. Hebert may avail himself of the tort immunity provisions of the Worker's Compensation statute if he was a direct or borrowed employee of Frees at the time of the accident.
Because we are unable to determine which theory of employment status the jury relied upon in reaching its decision, we must disregard its finding of co-employee status.
*738 Ordinarily factual findings of the jury are accorded great weight and may not be disturbed by the appellate court in the absence of manifest error. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La. 1978). However, when the jury verdict is based on instructions which were faulty in a critical regard, the verdict is tainted and is not entitled to a presumption of regularity. Schwamb v. Delta Air Lines, Inc., 516 So.2d 452 (La.App. 1st Cir.1987), writ denied, 520 So.2d 750 (La.1988). In such a case, the appellate court must make an independent review of the record before it and render judgment on the merits. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). Those factual findings which were not affected by the erroneous instruction or ruling are entitled to the usual standard of review (manifest error). Schwamb, 516 So.2d at 460. The erroneous instruction regarding statutory employment tainted the jury's verdict concerning Mr. Hebert's employment status. We must therefore determine his status from our independent review of the record. The remainder of the jury verdict was not tainted by the erroneous jury instruction and will be examined under the usual manifest error standard.
Mr. Hebert contends that he was the direct employee of Frees because he was not an independent contractor as that term is defined in the worker's compensation statutes. The Louisiana Worker's Compensation Act, LSA-R.S. 23:1021(6), defines independent contractor as follows:
(6) `Independent contractor' means any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of this Chapter unless a substantial part of the worktime of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter.
Juxtaposed to the Act's definition of independent contractor is the provision in LSA-R.S. 23:1044 which provides that a person who renders service for another is presumed to be an employee within the worker's compensation statute. Of course, this presumption may be rebutted by sufficient proof of contractor status. Locker v. Wilson, 536 So.2d 441 (La.App. 2d Cir. 1988), writ denied, 537 So.2d 210 (La.1989).
Ultimately, the distinction between employee and independent contractor status is a factual determination which must be decided on a case-by-case basis, taking into consideration the total economic relationship between the parties and the various factors weighing either in favor of or against an employer-employee relationship. Sones v. Mutual of Omaha Insurance Company, 272 So.2d 739 (La.App. 2d Cir.1972), writ denied, 273 So.2d 292 (La. 1973); Pitcher v. Hydro-Kem Services, Inc., 551 So.2d 736 (La.App. 1st Cir.), writ denied, 553 So.2d 466 (La.1989). The term independent contractor as it is defined by the Louisiana courts connotes a freedom of action and choice with respect to the undertaking in question, as well as a legal responsibility on the part of the contractor in the event the agreement is not fulfilled in accord with its covenants. Id.
A principal and independent contractor relationship exists when the following conditions are met:
1. There is a valid contract between the parties;
2. The work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it;
3. The contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;
4. There is a specific price for the overall undertaking; and
5. Specific time or duration is agreed upon and not subject to termination at *739 the will of either side without liability for breach.

Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385 (1972); Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483 (1955).
Smith v. Crown Zellerbach, 486 So.2d 798, 801 (La.App. 1st Cir.1986), writ denied, 489 So.2d 246 (La.1986).
The most important factor in determining whether a person hired to do certain work is an independent contractor or an employee is the control over the work reserved by the employer. In making this determination it is not the supervision which is actually exercised that is significant; rather, it is the right to exercise it which is of primary concern. Hickman, 262 So.2d at 391.
In the instant case there was no written contract for a specific undertaking as a unit or as a whole. However, Mr. Hebert verbally contracted with Frees' superintendent, Mr. Charlie Heard, to perform welding services for Frees. According to Mr. Hebert, there were no wage negotiations between him and Mr. Heard; he was told what Frees was paying for welders and equipment, and he was asked if this amount was acceptable to him. There was no specific duration of employment agreed upon. Although it was generally understood that Mr. Hebert would be performing the necessary welding for the Shell project, he was also available for other welding projects as reflected by his testimony that he worked at the Frees construction yard for three days prior to beginning work at the Shell Plant. He stated, "I spent approximately three days  maybe three days at Frees' yard doing some utility work and something for one of the jobs. Whether it was this one [Shell] or not I really don't know." When asked who established his work hours, Mr. Hebert responded: "At the yard, it was the yard superintendent, Mr. Heard. On this job here at Shell, it was Mr. Fred Stovall." From this uncontroverted testimony it is clear that Mr. Hebert was not hired on a completed project basis.
Furthermore, the evidence shows that Mr. Hebert was paid an hourly wage throughout his relationship with Frees and was never paid on a completed project basis. Mr. Hebert would bill Frees weekly by invoice for his work. Although payment of wages on an hourly basis is a strong indication of employee status, the evidence also shows that income taxes were not withheld by Frees and Frees did not furnish any fringe benefits to Mr. Hebert; of course these factors militate against a finding of employee status. We also note that Mr. Hebert supplied his own welding equipment, indication of an independent contractor status; however Frees provided all the necessary pipe, pipe fittings and a cherry picker to complete the Shell project. "When the principal provides the equipment and supplies to perform the job, the relationship is usually one of employment." Pitcher, 551 So.2d at 739.
Mr. Stovall testified that he was the project supervisor, and that he oversaw all work being performed. At the beginning of the welding project, Mr. Stovall and Mr. Keene, Shell's project supervisor, met with Mr. Hebert and Mr. Ferrier for fifteen minutes to go over the print specifications of the required welding. Thereafter Mr. Hebert and Mr. Ferrier performed their welding according to the prints and any additional field measurements which they performed with Mr. Stovall; they also made requested changes as the construction progressed. If the welders had a problem with a measurement or not having equipment or pipe they would go to Mr. Stovall. Although Mr. Hebert's method of welding was not supervised by Frees, essentially all other aspects of Mr. Hebert's job were controlled by Frees, including direction of when and where to work, reprimands and docking of wages, and direction as to how to remove the pipe from the pipe jacks. It is also clear that Mr. Stovall had the power to discharge Mr. Hebert at will and that Mr. Hebert could terminate his employment with Frees without any liability for breach of contract.
An additional factor bearing on the status issue is whether the worker is performing services that are an integral part of the *740 principal's business, or whether the worker is performing work independent of the principal's business. The evidence revealed that Frees was primarily involved in industrial plant construction and that it occasionally hired welders for that work. Frees' employees testified that they contracted out all of their welding and electrical work. The fact that Frees did not have enough welding work to support a full time welder does not, in itself, preclude a finding that welding was an integral part of its business. Frees was in the business of industrial plant construction which occasionally required welding work. To engage in general construction business, the contractor must perform all phases of the project. In this respect we must conclude that welding was an integral part of Frees' business.
Considering the evidence as a whole, we find that Mr. Hebert's verbal agreement did not call for a specific piecework as a unit, nor was a specific price agreed upon for the undertaking. He was paid on an hourly basis, and was not hired on a completed project basis. Mr. Hebert was subject to termination by Frees, without liability for breach of contract. His work was directed by Frees in every aspect except the method of welding. Given these factors, as well as the presumption of employee status in LSA-R.S. 23:1044, we conclude that the evidence preponderates in favor of employee status.
The evidence also shows that at the time of the accident, Mr. Hebert was an employee functioning in the course and scope of his employment with Frees, and the accident arose out of the course and scope of employment. LSA-R.S. 23:1031.

STRICT LIABILITY OR NEGLIGENCE OF SHELL
The plaintiff contends that the crowded condition of the worksite provided by Shell was a contributing cause of the accident. The plaintiff focuses on the 40-foot lengths of pipe which were lying parallel to the roadway, within three to five feet from the pipe jacks.[4] According to plaintiff's theory of the accident, the crowded conditions of the workplace prevented him from jumping out of the way of the bouncing pipe.
In support of his case, plaintiff introduced the testimony of Dr. Gary Nelson, who was accepted by the court as an expert in industrial safety. He testified that it was not possible to store the pipe at a 90-degree angle to the road because of the narrow area designated by Shell. In his opinion the area was unsafe because it was congested. However, Dr. Nelson admitted on cross examination that the area was safe for regular welding work, but not for pushing pipe off of pipe jacks.
On appeal the plaintiff argues that the trial court committed reversible error by failing to charge the jury on the law of strict premises liability and the duty of Shell to refrain from negligently maintaining an unsafe workplace.
The trial court need only give those jury instructions which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. Sparacello v. Andrews, 501 So.2d 269 (La.App. 1st Cir.1986), writ denied, 502 So.2d 103 (La. 1987). As stated by this court in Sparacello:
The judge has a duty to charge the jury as to the law applicable in a case and the correlative right and responsibility to require that the jury get only the correct law. It is the judge's responsibility to reduce the possibility of confusing the jury, and he may exercise the right to decide what law is applicable to prevent counsel from arguing law which the trial judge deems inappropriate.
501 So.2d at 277.
In order to show negligence against an owner, a plaintiff must prove that the thing created an unreasonable risk of injury that resulted in damage, that the owner knew or should have known of the risk, and the owner failed to either remedy *741 the situation, render the thing safe or take steps to prevent injury. Young v. Royal Jones & Associates, 521 So.2d 798, 802 (La.App. 2d Cir.1988). Under strict liability the plaintiff is relieved only of proving the owner's knowledge of the defect. He must still prove that the thing presented an unreasonable risk of harm which resulted in the damage. Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982).
In the instant case, there is no dispute over Shell's knowledge of the conditions existing at the worksite; through its on-the-job employees, such as its inspector, George Keene, Shell had knowledge of the conditions. Consequently, if the conditions of the worksite could have been a cause of the accident, it was error for the trial court to fail to charge the jury on either or both the strict liability and the negligence of Shell.
In view of the facts involved in the instant case we cannot say that the trial court abused its discretion in refusing to give the jury instructions on Shell's negligence or strict liability. The record does not support a finding by the jury, if one had been made, that the condition of the worksite caused plaintiff's injury. The condition of the worksite was not a substantial cause of the accident.
Recently, this court had occasion to examine the law of strict liability in a case similar to the case sub judice. In Davis v. State Farm Ins. Co., 558 So.2d 636 (La. App. 1st Cir.1990), the plaintiff was injured when struck on the foot by a piece of pipe which had been thrown from a ladder, hit the concrete floor, and bounced into the air. In rejecting the plaintiff's contentions that strict liability should attach to the lessee of the premises, we noted that the cause of the injury was the discarding of the pipe, not any defect in the premises themselves. Likewise, the cause of Mr. Stovall's injury was the bouncing of the pipe off the pipe jack, not the presence of the other pipe on the ground. To say that Mr. Stovall would have been able to dodge the bouncing pipe but for the presence of the other pipe in the vicinity of the pipe jack is pure speculation. In Davis, we explained the law of strict liability as follows:
LSA-C.C. art. 2317 provides, in pertinent part, as follows:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
In order to establish liability and the entitlement to recovery under LSA-C.C. art. 2317, the plaintiff must prove: (1) the thing had a vice or defect; (2) the thing was in the defendant's custody; and (3) the injury or damage was caused by the vice or defect. Upon proof of these elements, the burden shifts to the defendant to prove the damage was caused by victim fault, third-party fault, or an irresistible force. Loescher v. Parr, 324 So.2d 441 (La.1975); Ross v. Lewis, 446 So.2d 1322 (La.App. 2nd Cir. 1984).
A defendant's conduct is actionable where it is both a cause in fact of the injury and a legal cause of the harm incurred. The cause in fact test requires that but for the defendant's conduct, the injuries would not have been sustained. The legal cause test requires that there be a substantial relationship between the conduct complained of and the harm incurred. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Landry v. State Farm Insurance Company, 529 So.2d 417 (La. App. 1st Cir.1988); Stephens v. Pacific Employers Insurance Company, 525 So.2d 288 (La.App. 1st Cir.1988), writ denied, 532 So.2d 116 (La.1988); Edwards v. City of Leesville, 465 So.2d 263 (La.App. 3rd Cir.1985), writ denied, 467 So.2d 539 (La.1985). There can be more than one cause in fact of an accident as long as each cause bears a proximate relation to the harm which occurs and it is substantial in nature. Landry v. State Farm Insurance Company, supra; Nix v. Brasly, 489 So.2d 1038 (La. App. 1st Cir.1986); Bodoin v. Daigle, 452 So.2d 828 (La.App. 3rd Cir.1984), writ denied, 458 So.2d 485 (La.1984). However, whether the plaintiff seeks recovery *742 under a negligence or strict liability theory, he must prove that the negligent act or defect complained or was a cause in fact of the injury. Edwards v. City of Leesville, supra.

558 So.2d at 640.
Accordingly, we conclude that this assignment of error by the plaintiff is without merit.

VICARIOUS LIABILITY OF SHELL
Because of our finding that Mr. Hebert was a direct employee of Frees, which, in turn, was an independent contractor hired by Shell, we need not reach the plaintiff's assignments of error regarding the vicarious liability of Shell for Mr. Hebert's negligence. In most cases, under Louisiana law, a principal is not liable for the offenses an independent contractor commits in the course of performing its contractual duties. See Davis, 558 So.2d 636, and cases cited therein. Two well established exceptions are when the injury results from an ultrahazardous activity and when the principal reserves the right to supervise or control the work of the contractor. The case sub judice does not fall under either of the exceptions. There is no dispute that the work being performed was not ultrahazardous. The evidence is insufficient to prove that Shell maintained control over Frees' employees, including Mr. Hebert. The only involvement of Shell with the welders was the issuance of permits[5] to perform the work.
This assignment of error is without merit.

ALLSTATE LIABILITY POLICY
Finally, we reach the issue of whether the accident occurred during the loading of Mr. Hebert's truck. At trial the plaintiff urged that the Allstate policy provided coverage for his injury because the removal of the pipe from the pipe jack was a part of the loading of Mr. Hebert's vehicle.
We note that the evidence of Mr. Hebert's activities immediately preceding the accident does not compel a finding that he was in the process of loading his vehicle. Because reasonable minds could differ on this factual question, we cannot say that the jury was clearly wrong in concluding that Mr. Hebert was not in the process of loading his vehicle at the time of the accident. Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106 (La.1990).
This final assignment of error lacks merit.
For the reasons set forth we affirm the jury verdict and the trial court's dismissal of all of plaintiff's claims against Mr. Hebert, Shell Oil Co. and Allstate Insurance Co. All costs to be assessed against plaintiff.
AFFIRMED.
EDWARDS, J., concurs.
NOTES
[1] Plaintiff's claims are against Shell Western E & P, Inc., incorrectly referred to as Shell Oil Co. in the original petition.
[2] Frees ceased business operations in 1988.
[3] Glynn Ferrier, the other contract welder on this job, testified that the welders were not required to have their own worker's compensation insurance.
[4] Although Mr. Hebert estimated the distance between the ground pipe and the pipe jacks to be ten feet, the remaining witnesses consistently testified that the distance was approximately three to five feet.
[5] Frees was required to obtain a daily work permit and its welders were required to obtain a daily hot permit.