735 So.2d 17 (1999)
Barell BILLIOT
v.
TERREBONNE PARISH SHERIFF'S OFFICE and Julien D. Boudreaux, IV.
No. 98 CA 0246.
Court of Appeal of Louisiana, First Circuit.
February 19, 1999.
Rehearing Denied April 14, 1999.
Writ Denied July 2, 1999.
*19 Darryl J. Tschirn, La Jolla, CA, for plaintiff-appellee Barell Billiot.
Joseph J. Weigand, Jr., Weigand & Dodd, Houma, LA, for defendant-appellee Jerry J. Larpenter, Sheriff for the Parish of Terrebonne.
Robert B. Butler, III, Houma, LA, for defendant-appellee Julien D. Boudreaux, IV.
Charles Hanemann, J. Mark Graham, Kevin J. Webb, Henderson, Hanemann & Morris, Houma, LA, for defendant-appellant Alliance General Ins. Co.
BEFORE: LeBLANC, FOGG, and PARRO, JJ.
PARRO, J.
Alliance General Insurance Company (Alliance) appeals a trial court judgment maintaining a jury's verdict in this case arising out of an automobile accident that caused serious injury to Barell Billiot. We affirm.

FACTUAL BACKGROUND
Julien D. Boudreaux, IV was a deputy sheriff employed by Jerry Larpenter, Sheriff of Terrebonne Parish. Boudreaux was driving an unmarked sheriffs vehicle about noon on May 25, 1995, when he turned from a side road onto Highway 24, which consists of four lanes, two in the direction of Thibodaux and two in the direction of Houma, separated by a wide median. Unfortunately, he turned the *20 wrong way on Highway 24 and headed south toward Houma in one of the northbound lanes. When Boudreaux saw cars approaching in his lane of travel, he realized he was going the wrong way, locked his brakes, and moved as far right as he could. One oncoming car managed to turn out of his path into the other lane. Billiot, who was directly behind that car, swerved slightly to the right, but had no real opportunity to avoid Boudreaux's vehicle. Boudreaux hit the front driver's side of Billiot's car, severely injuring Billiot. At the time of the accident, Boudreaux was on a two-day paid vacation. However, he was driving a sheriffs vehicle that was permanently assigned to him for his official and personal use and was en route to the sheriffs motor pool to have the car washed and serviced.
Sheriff Larpenter participated in the Louisiana Sheriffs' Association Risk Pool (LaSHARP), a pool created under the auspices of the Louisiana Sheriffs' Association to spread certain risks and provide risk management. Although technically not an insurer, LaSHARP functioned as a primary insurer, in that it was obligated to indemnify participating sheriffs for the first $100,000 of damages resulting from any automobile accident. LaSHARP insured the participating sheriffs under a policy form comparable to a business automobile liability insurance policy, which covered all scheduled automobiles driven with the permission of the insured sheriffs. These vehicles were covered at all times, whether they were being used for official or personal business. The LaSHARP policy specifically covered the car assigned to and driven by Boudreaux when this accident occurred.
Along with the other sheriffs in the association, Sheriff Larpenter had also purchased an excess automobile liability policy issued to his office through LaSHARP by Alliance. This policy had limits of $900,000 over the underlying $100,000 provided by LaSHARP. Alliance denied coverage for Boudreaux's accident, contending he did not meet its policy's definition of "insured," because he was not acting within the scope of his employment duties when the accident occurred.
Billiot sued Boudreaux, Sheriff Larpenter, LaSHARP, and Alliance. Before trial, LaSHARP paid $100,000 to or on behalf of Billiot, and was dismissed from the litigation. The claims against the sheriff were reserved for resolution by the court, and the remaining claims were tried to a jury. The jury found Boudreaux was 100% at fault and awarded Billiot a total of $743,114.74 in damages. The jury also found Boudreaux was in the scope of his employment duties when the accident occurred, and therefore there was coverage under the Alliance policy. Although it also found Alliance was in bad faith in dealing with Billiot, the jury found no bad faith damages were suffered and made no award for this claim. The court found Sheriff Larpenter was not liable and dismissed Billiot's claims against him.[1] Judgment was rendered accordingly. Alliance's motion for new trial and/or judgment notwithstanding the verdict was denied and Alliance appealed.

COMPARATIVE NEGLIGENCE OF BILLIOT
In two of its assignments of error, Alliance addresses the comparative negligence of Billiot, claiming the jury's finding that Billiot was not negligent was tainted by incomplete jury instructions and is manifestly erroneous. Alliance contends the court should have instructed the jury that speeding gives rise to a presumption of negligence and that, if the jury found Billiot was speeding, the burden shifted to him to rebut the presumption of comparative negligence. Arguing that this incomplete jury instruction interdicted the jury's *21 finding, Alliance suggests this court should review this issue de novo and decide the issue of comparative negligence.
The standard of appellate review of the factual findings of a jury is a two-part test: 1) the appellate court must find from the record there is a reasonable factual basis for the finding of the jury, and 2) the appellate court must further determine that the record establishes that the finding is not clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Factual findings should not be reversed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). If the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Mitchell v. State Farm, 94-0548 (La.App. 1st Cir. 3/3/95), 652 So.2d 652, 655, writs denied, 95-0767 and 95-0770 (La.4/28/95), 653 So.2d 1180.
However, when the jury verdict is based on instructions which were faulty in a critical regard, the verdict is tainted and is not entitled to a presumption of regularity. Stovall v. Shell Oil Co., 577 So.2d 732, 738 (La.App. 1st Cir.), writ denied, 582 So.2d 1309 (1991). The general rule, first detailed in Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975), is that where an erroneous jury instruction is given that constitutes reversible error, the jury decision should be thrown out and the appellate court should undertake a de novo review of the record and implement its own judgment based on the evidence. Odom v. Colonel Sanders Kentucky Fried Chicken, 93-1084 (La.App. 1st Cir. 4/8/94), 636 So.2d 1027, 1028.
In a jury trial, the judge is not required to give the instructions submitted by either party; however, the trial judge is obligated to give instructions which properly reflect the law applicable in light of the pleadings and facts in each case. Adequate instructions are those instructions which fairly and reasonably point out the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application to the facts. Haydel v. Hercules Transport, Inc., 94-1246 (La.App. 1st Cir. 4/7/95), 654 So.2d 418, 429, writ denied, 95-1172 (La.6/23/95), 656 So.2d 1019. An appellate court must exercise great restraint before overturning a jury verdict on a suggestion that the jury instructions were so erroneous as to be prejudicial. Hurts v. Woodis, 95-2166 (La.App. 1st Cir. 6/28/96), 676 So.2d 1166, 1173.
The trial court charged the jury on the defense of comparative fault, quoting Civil Code article 2323 and explaining Louisiana's law that substandard conduct of injured persons, which contributes to their own injury, will reduce their recovery, but not bar it entirely. Further instructions included the following:
Comparative fault is fault on the part of the person injured, which cooperates in some degree with the negligence of another, and helps to bring about an injury, death or loss. By the defense of comparative fault, the defendants in effect allege that even though he (sic) may have committed some negligent act or omission which was one of the causes of the accident, the plaintiff, by his own fault (sic) to use ordinary care under the circumstances for his own safety, at the time and place in question, was himself a legal cause of any injuries and/or death and/or loss and damages the plaintiff may have suffered.
* * * * * *
The burden is on the defendant alleging comparative fault to prove any fault of the plaintiff. The defendant has the burden to establish by a preponderance *22 of the evidence that the plaintiff in this case was at fault and that this fault contributed to the injuries and damages he may have sustained.
The jury interrogatory on this issue asked:
Was the accident caused by the negligence of Barell Billiot, that is, was his conduct below the standard of care to provide for his own safety, and thus, was Barell Billiot at fault and a legal cause of his own damages?
The unanimous response of the jury was, "No."
Alliance suggests the evidence is undisputed that Billiot was speeding at the time of the accident, and therefore the jury should have been charged that this statutory violation gives rise to a presumption of negligence and a shift in the burden of proof. The facts adduced at trial bearing on Billiot's negligence reveal the speed limit at the accident site was 45 miles per hour. One witness testified Billiot was speeding as he approached the accident site. Kenneth Dupaty stated he was traveling northbound on Highway 24 and had reached a speed of 55 miles per hour in the left lane while passing another car. Immediately after Dupaty moved back into the right lane, Billiot passed him, going at least 55 miles per hour. Shortly thereafter, the accident occurred. However, Dupaty's testimony did not establish how long it was after Billiot passed him that the accident occurred or how far Billiot traveled after passing him before the accident occurred. Also, Dupaty had no recollection of another vehicle preceding Billiot in Billiot's lane of travel immediately before the accident. Billiot testified that, just before the accident, he was traveling at a speed of 45 miles per hour behind another car, which was also going 45 miles per hour before it swerved to the right to avoid Boudreaux. Billiot was able to swerve only slightly to the right before Boudreaux's vehicle hit him. The accident report indicated Billiot's speed was 45 miles per hour.[2] Boudreaux confirmed that one oncoming car moved out of his path into the right lane, exposing Billiot's vehicle and leaving Billiot with no opportunity to take effective evasive action. Boudreaux admitted he was at fault in causing the accident, and opined there was nothing else Billiot could have done to avoid the collision. There was no testimony from which the jury could conclude that, assuming Billiot was speeding, he could have avoided the accident by traveling at or below the posted speed limit. In other words, there was no evidence to establish a causal link between the purported speeding and the accident.
Given this evidence, the trial court did not err in omitting the instruction concerning the presumption of negligence and shift in the burden of proof, were the jury to find that Billiot was speeding. The jury's finding on this issue suggests the jury either did not believe Billiot was speeding or, if it thought he was speeding, it did not believe this speeding caused the accident. Either conclusion was amply supported by the evidence. The court's instructions were not faulty in a critical regard; rather, the instructions fairly and reasonably pointed out the issues presented by the evidence in this case. We conclude the jury's findings were not interdicted by the omission of this instruction and the jury's conclusion that Billiot was not comparatively negligent was not manifestly erroneous.

INSURANCE COVERAGE UNDER ALLIANCE POLICY
The case against Alliance is premised on two different theories of policy interpretation. Sheriff Larpenter asserts the policy language is ambiguous and should therefore be interpreted in favor of coverage. He testified his intent in purchasing the excess policy was to buy more insurance *23 for the department's cars covered by the underlying policy, and to cover those units at all times and under all circumstances, just as provided by the LaSHARP policy. The LaSHARP policy listed a schedule of covered automobiles and defined the "insured" as "You for any covered `auto,'" and "Anyone else while using with your permission a covered `auto' you own, hire or borrow...." The Alliance policy has a different definition of the "insured," which imposes some limitations on coverage. This definition states:
"Insured" means the person or organization named on the Declarations page including any executive officer, director or stockholder thereof while acting within the scope of his duties as such and any person employed by the "Insured" while acting within the scope of his duties as such.
Under this definition, coverage is not extended at all times and places for particular vehicles. Rather, coverage extends only to certain persons under certain circumstances. The Alliance policy also contains the statement:
The provisions of the immediate underlying policy are incorporated as part of this policy, including any endorsements or modifications made prior to the happening of an occurrence, except for... any other provisions therein which are inconsistent with the provisions of this policy.
An endorsement to the Alliance policy further states:
In the event of conflict between the terms, conditions or exclusions of this policy and the terms, conditions or exclusions of any underlying policy, the terms, conditions and exclusions of this policy shall apply.
The sheriff argues that, because the underlying policy covered all the scheduled automobiles at all times and defined the insured with reference to those automobiles, the Alliance policy should provide coverage to the same extent and under the same circumstances, but for additional amounts. The sheriff contends that, by first incorporating the provisions of the underlying policy, and then excluding some of those provisions, the Alliance policy is ambiguous and should be interpreted in favor of coverage. The sheriff also contends Boudreaux was not acting within the scope of his duties when the accident occurred, but still should be covered because the internal inconsistency created by the Alliance policy should be interpreted against Alliance and in favor of coverage.
On the other hand, the second theory of recovery against Alliance is based on the assertion that Boudreaux was specifically covered because he met the definition of an "insured" under the Alliance policy. Billiot claims Boudreaux, an employee of the sheriff, was acting within the scope of his duties as a deputy sheriff when the accident occurred; Boudreaux agrees with this contention. The jury also agreed, finding Boudreaux "was within the scope of his duties as an employee of the Terrebonne Parish Sheriff's Office at the time of the accident on May 25, 1995," and that Alliance had "in full force and effect a policy of excess liability insurance that covered the sheriff's department vehicle" driven by Boudreaux that day.
In one of its assignments of error, Alliance contends its policy precludes coverage for Boudreaux, because he fails to meet the policy definition of an "insured." Alliance concedes the question of whether or not Boudreaux was acting within the scope of his employment duties is a factual issue and was properly presented to the jury, but argues that, under the facts of this case, the jury's finding is manifestly erroneous. In another assignment of error, Alliance argues that its policy is clear and unambiguous; it includes only those portions of the underlying policy that are consistent with the Alliance policy's provisions. Therefore, the court should not have allowed Sheriff Larpenter to testify concerning his intentions in purchasing the policy. Alliance claims the jury finding *24 was improperly tainted by hearing this respected public official testify concerning his intentions when purchasing the excess liability policy. Another assignment of error contends the issue of coverage is a legal issue, not a factual issue, and the court erred in allowing the jury to decide this issue.
An insurance policy is a contract between the insured and the insurer and has the effect of law between the parties. Highlands Underwriters Ins. Co. v. Foley, 96-1018 (La.App. 1st Cir. 3/27/97), 691 So.2d 1336, 1340. Because an insurance policy is a contract, the rules established for the construction of written instruments apply to contracts of insurance. Epps v. City of Baton Rouge, 604 So.2d 1336, 1349 (La.App. 1st Cir.1992). The Louisiana Civil Code defines interpretation of a contract as "the determination of the common intent of the parties." LSA-C.C. art. 2045; Dunn v. Potomac Ins. Co. of Illinois, 94-2202 (La.App. 1st Cir. 6/23/95), 657 So.2d 660, 663. The intention of the parties is to be determined in accordance with the plain, ordinary, and popular sense of the language used in the agreement and by giving consideration on a practical basis to the instrument in its entirety. Coates v. Northlake Oil Co., Inc., 499 So.2d 252, 255 (La.App. 1st Cir. 1986), writ denied, 503 So.2d 476 (La. 1987).
Ambiguity in an insurance policy must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions. LSA-C.C. art. 2050. After applying the other general rules of construction, if an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as understood in the insurance context, in favor of the insured. This rule of strict construction requires that ambiguous policy provisions be construed against the insurer who issued the policy and in favor of coverage to the insured. Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 93-0911 (La.1/14/94), 630 So.2d 759, 764. Ambiguity will also be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered. Breland v. Schilling, 550 So.2d 609, 610-11 (La.1989).
Yet, if the policy wording at issue is clear and it unambiguously expresses the parties' intent, the insurance contract must be enforced as written. Schroeder v. Bd. of Supervisors of Louisiana State Univ., 591 So.2d 342, 345 (La. 1991). When the words of a contract are clear, no further interpretation may be made to determine the parties' intent. LSA-C.C. art. 2046. The determination of whether a contract is clear or ambiguous is a question of law. Watts v. Aetna Casualty and Sur. Co., 574 So.2d 364, 369 (La. App. 1st Cir.), writ denied, 568 So.2d 1089 (La.1990).
We address first Alliance's argument that the issue of whether a policy of insurance provides coverage is, in every case, a purely legal question which should not be put to a jury. We disagree. This statement is accurate in the context of motions for summary judgment, which by definition can be decided by the court because there are no material facts at issue, and the court is evaluating coverage as a question of law. However, it is not accurate in a context, such as this case, in which a factual finding is necessary in order to reach the coverage issue. Alliance admitted that its policy would provide coverage to Boudreaux if, at the time of the accident, he was engaged in activities within the scope of his employment duties. Alliance further acknowledged that this was a factual inquiry and was properly presented to the jury. The jury made a factual finding that Boudreaux was acting pursuant to those duties when the accident occurred, and it was on this factual basis that the jury found the Alliance policy covered him for the damages he caused to *25 Billiot. The jury also made a factual finding that the Alliance policy was in full force and effect and covered the vehicle driven by Boudreaux. Accordingly, the court did not err in allowing the jury to evaluate the evidence to determine whether, under the facts of this case, Boudreaux was acting within the scope of his employment duties when the accident occurred, such that the Alliance policy provided coverage to him.
In another assignment of error, Alliance argues that this finding was manifestly erroneous, because the evidence shows Boudreaux was not acting in the scope of his duties when the accident occurred. Although often equated with the phrase, "in the course and scope of employment," the phrase used in the Alliance policy is somewhat narrower. Technically, "course of" may refer more to the time and place of employment, while "scope of" refers more to being engaged in the functions for which employed. LeBrane v. Lewis, 292 So.2d 216, 218, n. 4 (La.1974). Interpreting this phrase in Barnes v. Thames, 578 So.2d 1155, 1167 (La.App. 1st Cir.1991), this court noted that where the injury is caused by an employee's negligence while driving a vehicle owned by his employer, every case must be decided on its own facts. This court summarized the jurisprudence, observing that important considerations which bear on the result are whether the vehicle was being used in such a manner as to benefit the employer; whether the employee was subject to the employer's control at the time of the accident, whether the employee's use of the vehicle was authorized by the employer, and whether the employee's motive arose from personal objectives or, instead, from his employer's concerns. Barnes, 578 So.2d at 1167. Additional factors noted by the Louisiana Supreme Court are the payment of wages by the employer, the employee's duty to perform the particular act, the relationship between the employee's act and the employer's business, the benefits received by the employer from the act, and the reasonable expectation of the employer that the employee would perform the act. Orgeron ex rel. Orgeron v. McDonald, 93-1353 (La.7/5/94), 639 So.2d 224, 227.
The evidence bearing on this issue includes the following facts. Boudreaux was employed by the sheriff and was enjoying two days of paid vacation. When the accident occurred, he was on his way to the sheriff department motor pool to have his assigned vehicle washed and serviced. The unmarked car he was driving was owned by the sheriff's office; it was permanently assigned to him for his personal or official use twenty-four hours per day, every day. The sheriffs policy manual stated it was the responsibility of each officer to keep all equipment clean and in working order, and the sheriff acknowledged Boudreaux was expected to keep his assigned unit clean and maintained. However, he was not required to take care of this during time off, and no one had told him to have the car serviced that particular day. Although he was on vacation, Boudreaux had his credentials and weapon with him and had his radio on because he was always "on call" for emergencies. Sheriff Larpenter acknowledged that the procedures manual required each off duty deputy to take necessary police action with regard to all serious police matters brought to his or her attention while off duty.
After reviewing this evidence in the light of the applicable factors established by the jurisprudence, we conclude the jury's factual finding that Boudreaux was acting within the scope of his employment duties when the accident occurred was not manifestly erroneous. The key factor which brings his activity within the scope of his duties is the fact that he was not engaged in a purely personal action, but was motivated by one of his job duties and was en route to the location where that duty could be performed. Maintenance of his assigned vehicle was essential to his job, was part of his stated job responsibilities, *26 and was a benefit to his employer. Accordingly, the jury did not err in reaching this conclusion, based on the facts in evidence.[3] And, based on this finding, the jury was also correct in determining the Alliance policy covered Boudreaux when this accident occurred.
Given this factual finding and Alliance's admission that, under these circumstances, its policy would provide coverage for Boudreaux, there was no need to determine whether the Alliance policy was ambiguous in some general sense, and the jury did not base its coverage determination on that theory of recovery.[4] However, Alliance argues its policy is unambiguous and therefore the court should not have allowed Sheriff Larpenter to testify concerning his intent. Alliance claims this testimony prejudiced the jury against Alliance and altered the jury's verdict. We disagree. The question of the intention of the parties is relevant in interpreting the words of a contract. More significantly, in addition to testifying concerning his intent, Sheriff Larpenter also stated he did not consider Boudreaux was engaged in any employment duties when the accident occurred. Yet, the jury found to the contrary. Clearly, the jury evaluated the evidence objectively, without according undue deference to the sheriffs opinions. Accordingly, this assignment of error is without merit.

DAMAGES
The jury awarded the following damages:

A. Past medical expenses: $ 60,114.74
B. Future medical expenses: 30,000.00
C. Past physical and mental pain and
 suffering: 125,000.00
D. Future physical and mental pain
 and suffering: 85,000.00
E. Permanent/partial disability: 75,000.00
F. Past loss of earnings: 18,000.00
G. Future loss of earning capacity: 350,000.00
 ___________
 TOTAL $743,114.74

Alliance contends the jury's award of $285,000 in general damages was clearly excessive. This award included $75,000 for permanent partial disability, $125,000 for past physical and mental pain and suffering, and $85,000 for future physical and mental pain and suffering.
There is no mechanical rule for determining general damages and the facts and circumstances of each case must control. Angeron v. Martin, 93-2381 (La. App. 1st Cir. 12/22/94), 649 So.2d 40, 43. The trier of fact is accorded much discretion in fixing general damage awards. LSA-C.C. art. 2324.1; Gardner v. Griffin, 97-379 (La.App. 1st Cir. 4/8/98), 712 So.2d 583, 589. Because the trier of fact's discretion in assessing damages is so great, a damage award should be disturbed on appeal *27 only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances of the case. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Whiddon v. Hutchinson, 94-2000 (La.App. 1st Cir. 2/23/96), 668 So.2d 1368, 1376, writs denied, 96-0731 and 96-0775 (La.5/10/96), 672 So.2d 923.
Billiot, who was twenty-three years old and in good health, was seriously injured in the accident. He had to be removed from his crumpled vehicle by the "jaws of life" and experienced severe pain and extreme breathing difficulty. Because his breathing problem did not resolve in the hospital, emergency exploratory surgery was performed the following day, revealing that his stomach had been plunged upward through his diaphragm. After this abdominal injury was repaired, Billiot received follow-up care from Dr. Christopher Cenac, an orthopedic surgeon, for his numerous other injuries. These included four broken ribs, a broken right leg, injury to his left axillary nerve affecting his left arm, a torn posterior cruciate ligament in his left knee, injury to his left hip socket joint, a ruptured disc in his lower back, and a fluid-filled cavity inside the spinal cord in his neck. The ruptured disc in Billiot's lower back did not respond to conservative treatment and ultimately required surgical repair. He continues to have some pain related to this injury. The torn ligament in his left knee requires Billiot to wear a large, heavy brace in order to maintain stability. Surgery will be required to achieve any greater stability in the left knee. Billiot often experiences debilitating headaches, resulting in weakness and nausea. According to Dr. Bradley J. Bartholomew, a neurosurgeon who examined Billiot, the fluid-filled cavity in his spinal cord, or syrinx, could conceivably worsen at some future time, compress the spinal cord, and cause quadriplegia. Although this is not probable, Dr. Bartholomew said because it does sometimes occur, this condition will have to be monitored for the rest of Billiot's life. Billiot will continue to live with the awareness of this possibility. Most of his injuries have healed, but because of the syrinx and residual problems with his lower back and left knee, Billiot's doctors have severely limited his activities and restricted him to light or sedentary work. He cannot return to any of the types of work he did before the accident.
Having reviewed the facts concerning Billiot's multiple injuries and resultant permanent disability, we do not find the jury's award of general damages is beyond the amount a reasonable trier of fact could assess.
Alliance further contends the award of $350,000 for lost future earning capacity is excessive. Awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Therefore, the trier of fact is given much discretion in fixing these awards. Hollenbeck v. Oceaneering Intl, Inc., 96-0377 (La.App. 1st Cir. 11/8/96), 685 So.2d 163, 175, writ denied, 97-0493 (La.4/4/97), 692 So.2d 421. When reviewing a trial court's award for loss of earning capacity, an appellate court should give deference to the trier of fact. Jackson v. Frisard, 96-0547 (La.App. 1st Cir. 12/20/96), 685 So.2d 622, 629, writs denied, 97-0193 and 97-0201 (La.3/14/97), 689 So.2d 1386, 1387. Such an award should not be set aside absent an abuse of discretion. Fontana v. Louisiana Sheriffs' Auto. Risk Program, 96-1579 (La.App. 1st Cir. 6/20/97), 697 So.2d 1030, 1034, writ denied, 97-2363 (La.1/9/98), 705 So.2d 1088. An award of loss of future income is not based merely upon the difference between a plaintiff's earnings before and after a disability injury. Rather, the award is predicated upon the difference between a plaintiff's earning capacity before and after a disabling injury. Birdsall *28 v. Regional Elec. & Const., Inc., 97-0712 (La.App. 1st Cir. 4/8/98), 710 So.2d 1164, 1170.
According to Billiot's testimony, documents concerning his employment history, income tax records, and information from former employers, he worked intermittently at a number of jobs after graduating from high school in 1988. Billiot's prior jobs included offshore and oilfield work, such as sandblasting and painting, roughneck, and roustabout. His hourly wages ranged from $7.68 per hour to $8.10 per hour. His best earning year was 1993, when he made $16,765.00. Billiot had not been a very consistent or reliable employee, and most of his jobs were of relatively short duration. He had taken some nursing courses at Nicholls State University, but did not finish college because he did not enjoy nursing work and his grades were not very good. Billiot testified he preferred working offshore and his plans were to work his way up in offshore employment.
A vocational rehabilitation counselor, Monica Salopek, testifying for the defendants, noted Billiot's doctors limited him to work in the sedentary to light duty range. Accordingly, he could not return to the kind of work he was doing before the accident. Test results showed Billiot had average intelligence and average mechanical abilities. Salopek opined that, based on his present level of skills and experience, without any additional training or education, Billiot could earn $4.75 to $6.00 per hour in the local economy. Salopek also said if Billiot obtained a college degree, he could make a starting wage between $22,000 and $37,000 per year. She indicated Billiot was a good candidate for vocational rehabilitation, and if he finished vocational training, could make $1000 to $1100 per month. However, she did not indicate any specific occupations available to Billiot in the locale, because she did not have information from him concerning his areas of interest. Salopek admitted she did not know what a syrinx is or what its implications were for Billiot's future rehabilitation. She also admitted Billiot was apparently unable to continue college, based on a note from Dr. Cenac stating Billiot could not return to college due to residual effects from his injuries.
Two economists testified. Dr. Melville Wolfson testified for Billiot. Wolfson researched the wage rate for actual openings in offshore work in the Houma/New Orleans area for persons with one year of experience or less. These jobs started at $8.00 per hour up to $12.00 per hour; Wolfson used $8.15 per hour as his base wage. Using a typical offshore type work schedule, he estimated the base lost income for such employment would be $22,461 per year if Billiot were totally and permanently disabled. Although Billiot had never earned that much in any given year, Wolfson testified it was not unusual for a young man's initial work experience to be somewhat erratic. Therefore he used earning potential or capacity, rather than relying on Billiot's actual previous annual income. Wolfson projected that the loss over Billiot's 32-year work-life expectancy, using a 7% discount and adjustments for inflation and average annual increases, would be $699,048 before taxes. Then, because Billiot was not totally disabled, but could do sedentary or light work, Wolfson used similar factors to compute an amount based on full-time minimum wage, starting at $5 per hour, over the same work-life expectancy. After deducting this amount, the difference, or estimated lost earning capacity, was $416,142 before taxes. On cross-examination, Wolfson admitted that if Billiot were able to complete his college education, his entry-level salary would be in the range of $22,400 per year and he would not experience any future wage losses. He also admitted he had no factual basis for assuming Billiot would be limited to $10,400 in the future. If, in fact, he were able to start at $6.00 per hour, his future annual earnings would be more than that. Also, if Billiot's actual earnings were averaged, and if this *29 amount represented what he could reasonably have expected to continue making, had he not been injured, his future wage loss would be zero.
Dan M. Cliffe, a certified public accountant, testified for the defendants as an expert in economic analysis and determination of economic loss. He computed Billiot's total future wage loss would be within a range of $29,735 to $44,730, over his work-life expectancy. Cliffe's projection was based on the average of Billiot's three best earning years, resulting in a wage base of $12,594 per year. To reach the estimate of $29,735 as future wage loss, Cliffe deducted the amount Billiot could earn over his lifetime as a full-time employee earning minimum wages, starting immediately. To reach the higher amount of $44,730, Cliffe estimated Billiot would lose four years from the work force while he returned to college to get his degree. However, after getting his degree, Cliffe estimated Billiot could earn at least as much as he could have made in offshore work, so his losses from that time forward would be zero. Similarly, if Billiot took two years for vocational training, he would lose about $25,000 during those years. Thereafter, if he earned $12,000 per year, his lifetime wage loss would be only $11,400. Cliffe admitted earning capacity might be more than the amount a person had actually earned. Cliffe did not criticize the discount rate used by Wolfson, but indicated Wolfson's calculations assumed Billiot's wages would increase by at least 7% per year, which was unreasonable. When asked to compute Billiot's future lost earning capacity, assuming he could earn minimum wage, and assuming Wolfson's $22,461 per year was an appropriate starting point, and applying a more conservative increase of 3½%, Cliffe opined the future loss would be $218,250. The jury awarded $350,000 for loss of future earning capacity.
This court cannot substitute its own judgment for that of the jury. We can only analyze the evidence presented to the jury to determine whether the damages awarded for lost future earning capacity were an abuse of the jury's discretion. Accordingly, we must examine whether there is a factual basis for the conclusion reached by the jury, or whether, as Alliance suggests, the amount awarded was based on pure speculation. Billiot's actual earnings records show he had earned as much as $8.00 per hour in offshore employment before the accident. This lends factual support to Wolfson's estimate that Billiot had the capacity to earn $8.15 per hour, resulting in a base lost wage of $22,461 per year. The vocational rehabilitation counselor testified Billiot could immediately earn from $4.75 to $6.00 per hour, with no additional training or education. These estimates represent approximately minimum wage, which is the amount Wolfson used to compute how much Billiot could earn in the future. Accordingly, there was evidence supporting both parameters which, applying Wolfson's calculations, resulted in $416,142, the highest estimate before the jury. Using these same parameters and applying a more conservative rate to project annual increases, Cliffe estimated the future lost earning capacity would be $218,250. The jury awarded an amount within this range, and accordingly, although we might disagree with that award, we cannot say it was an abuse of the jury's discretion.

CONCLUSION
Based on the foregoing, the judgment of the trial court, which was entered in conformity with the jury's verdict, is affirmed. All costs of this appeal are assessed against Alliance.
AFFIRMED.
NOTES
[1] The dismissal of all claims against the sheriff was not appealed by any party. Accordingly, that portion of the judgment is final.
[2] The investigating officer also stated in this report that he was unable to interview Billiot, due to his injuries. Accordingly, the information concerning Billiot's speed was obtained from other witnesses.
[3] Alliance also points out that the court dismissed the sheriff, apparently concluding he had no independent negligence or vicarious liability for Boudreaux's negligence. Since vicarious liability is based on the employee's being in the course and scope of his employment when the negligent act occurred, and the jury found Boudreaux was in the scope of his employment duties, Alliance contends the court's judgment is inconsistent with the jury's verdict. That may be. The court's written reasons for judgment address only the issue of the sheriff's independent negligence. However, the court may also have drawn some fine distinction between "the course and scope of" employment and "scope of" employment, as suggested by some of the jurisprudence, in which case the judgments are not necessarily inconsistent. Whether or not an inconsistency exists, the judgment dismissing the sheriff was not appealed, and is therefore final. This court can only review the jury's verdict for manifest error, and we have found none.
[4] The Alliance policy clearly incorporates only those provisions of the underlying policy which are consistent with its provisions. However, we note that the two policies define the ambit of coverage with very differing reference pointsthe LaSHARP policy refers to covered automobiles and the Alliance policy refers to covered persons. Such a basic incompatibility may not be capable of resolution simply by incorporating only such portions of the underlying policy as are consistent with the excess policy. Nevertheless, because the jury verdict was not based on a finding that the policy is ambiguous, we pretermit the question of whether or not the Alliance policy is ambiguous.