STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-859

TERRI SAYRE

VERSUS

PNK (LAKE CHARLES), LLC D/B/A L'AUBERGE DU LAC, ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2010-6055
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Billy Howard Ezell, Judges.

REVERSED AND RENDERED.

Thomas Joseph Solari
Woodley, Williams, Boudreau
P. O. Box 3731
Lake Charles, LA 70629
Telephone: (337) 433-6328
COUNSEL FOR:
    Defendants/Appellees - PNK (Lake Charles), LLC d/b/a L'Auberge Du
    Lac and Zurich American Insurance Company

Aaron Broussard
Broussard & Hart, LLC
1301 Common Street
Lake Charles, LA 70601
Telephone: (337) 439-2450
COUNSEL FOR:
    Plaintiff/Appellant - Terri Sayre

**THIBODEAUX, Chief Judge.**

In this trip and fall case, Terri Sayre appeals the trial court's judgment pursuant to a jury verdict in favor of the defendants, PNK (Lake Charles), LLC D/B/A L'Auberge Du Lac (L'Auberge) and Zurich American Insurance Company. Finding that the trial court committed prejudicial error in failing to charge the jury on the adverse presumption in an evidentiary matter, and following our de novo review, we reverse and render judgment in favor of the plaintiff.

## I.

## ISSUES

We must decide whether the trial court erred in refusing to charge the jury with the adverse presumption that evidence not produced by the defendant would have been unfavorable to the defendant.

## II.

## FACTS AND PROCEDURAL HISTORY

Terri Sayre, a 59-year-old nurse, was a guest at the L'Auberge hotel when she tripped and fell while walking down the corridor in front of Le Café restaurant on the premises of the hotel. The hotel's video surveillance depicts Ms. Sayre walking normally around a corner and into the corridor. She is alone and is moving purposefully. She continues down the corridor for approximately thirteen steps. Suddenly, she pitches forward, falling fast and hard and completely flat on her front, landing with her arms outstretched above her head. Her right shoe flies off just before she falls. Five witnesses rush to her while Le Café hostess Taylor Briggs runs past Ms. Sayre and across the corridor to call security, then returns to

the scene, per the hotel's standard operating procedures (SOP). She remains at Ms. Sayre's left side. One of the witnesses, in dark shirt and pants, is a retired EMT; he helps her turn over and sits at Ms. Sayre's head, appearing to cradle her head while examining her. Another witness, a man in a white tee shirt and white baseball cap, points to the floor. Five other people walk by. The man in the white shirt and cap walks over to Ms. Sayre's overturned shoe and slides it with his foot toward her. A seventh person, Le Café manager Kristi Storozyszyn comes from the restaurant and kneels on the floor, sitting at Ms. Sayre's side. An eighth person, a man in a white shirt and red apron comes out of Le Café and stands at the entrance watching. The Le Café hostess and manager appear to be looking at something on the floor.

A ninth person, a blonde woman in tan pants and white shoes, who approached from the other end of the corridor, and who was walking toward Ms. Sayre when she fell, stops and stands near the Le Café manager. A member of Hotel Security, wearing a red uniform coat, appears at the scene. Security talks to the Le Café manager, and the blonde lady explains to Security how Ms. Sayre fell, motioning with her hands out in front of her. Now that Security is there, the Le Café hostess walks slowly from the scene back to the restaurant, pursuant to the hotel's SOP. The blonde woman and the Le Café manager point to a spot on the floor, showing Security, who looks where they are pointing. The blonde woman talks to a man she seems to know in a gray shirt; she describes the fall to him, putting her hands out in front of her again. Le Café manager and Security reach toward Ms. Sayre and with the EMT all assist Ms. Sayre to a sitting position. The man in the gray shirt steps forward to assist if needed.

The blonde woman and the man in the gray shirt watch as the Le Café manager crawls on her hands and knees to a spot on the floor while Security leans in to look down. The Le Café manager rubs the spot on the floor with her right hand and sits back on her heels. Security looks on. Security, the EMT, the Le Café manager, the blonde woman, and the man in the gray shirt all listen while Ms. Sayre talks. The EMT shakes Ms. Sayre's hand and leaves. The blonde woman and the man in the gray shirt leave. Security and the Le Café manager stay. Ms. Sayre puts on her right shoe while seated on the floor. The Security person points at the floor as a second Security employee walks up to the scene. The two Security personnel talk, and the first Security person leaves. The second Security person and the Le Café manager help Ms. Sayre up to a standing position. The second Security person leaves the scene, and the Le Café manager and Ms. Sayre walk slowly into Le Café out of camera range.

The video ends after approximately four minutes. Contrary to the hotel's SOP, it does not depict L'Auberge Security personnel taking photographs, inspecting the floor, investigating the incident, or questioning or obtaining statements from any of the ten or so people at the scene, including L'Auberge employees. Contrary to the hotel's SOP, no employee statements and no witness names or statements were attached to the accident report.

Ms. Sayre accepted an ice pack but declined ambulance transport, though it was recommended. She signed a L'Auberge form refusing an ambulance transport, per L'Auberge's SOP. Ms. Sayre reported the sticky substance on the floor. She also reported injury to her left knee, right side of neck, upper abdomen, and left hand. Ms. Sayre said that her ribs hurt. Subsequently, she learned that she

3

had sustained three fractured ribs and a near full thickness rotator cuff tear requiring surgery.

A negligence suit was ultimately filed. Ms. Sayre asserted that there was a clear sticky substance on the floor at the scene that caused her shoe to stick, causing her to fall, and she asserted that one of the Le Café employees told her at the scene that three other people had fallen at that location on the same day. Ms. Sayre was unable to discover evidence of any employee or witness statement regarding her fall, or any report or inspection of previous falls or clean-ups in the area. At the time of the fall she was given only a hotel business card and, per the hotel's SOP, she was not given a copy of the hotel's accident report. The accident report produced during litigation indicated that there was no substance or debris on the floor at the location of the accident. During discovery and pre-trial proceedings, Ms. Sayre filed a second supplemental and amending petition asserting the following allegation in paragraph VIII:

> Plaintiff alleges that Defendants failed to properly secure and preserve important pieces of evidence, and actually has a system designed to do so, impeding injured persons like Plaintiff from proving their case, decreasing overall safety at the casino, and giving rise to the legal presumption that said evidence would have proved detrimental to Defendant's case.

When the matter proceeded to trial, Ms. Sayre requested that the trial court give the jury the following jury charge:

> The failure of a party to preserve a piece of evidence within his control raises a presumption that the evidence would have been detrimental to his case. This presumption is not applicable when the failure to preserve the evidence is reasonably explained. In this case if you find that any party had the opportunity to preserve or produce evidence but had failed to do so without a reasonable explanation you can presume that the evidence would have been unfavorable to that party.

4

Following the charge session with the attorneys on the last day of trial, the trial court informed the parties that it would not give the requested charge to the jury. Counsel for Ms. Sayre objected. After deliberations, the jury returned a verdict that there was no unreasonable risk of harm in the condition of the floor, and the trial court entered judgment in favor of the defendants. On appeal, Ms. Sayre asserts only one error, the trial court's failure to charge the jury on the adverse presumption of the missing evidence.

## III.

## <u>STANDARD OF REVIEW</u>

It is well settled in Louisiana jurisprudence that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. *Nicholas v. Allstate Insurance Company*, 99-2522 (La. 8/31/00), 765 So.2d 1017.[1] The basis for this rule of law is that trial courts are given broad discretion in formulating jury instructions, and it is well accepted that a trial court judgment will not be reversed as long as the charge correctly states the substance of the law. *Id*. However, when the jury verdict is based on instructions that were faulty in a critical regard, the verdict is tainted and is not entitled to a presumption of regularity. *Billiot v. Terrebonne Parish Sheriff's Office*, 98-246 (La.App. 1 Cir. 2/19/99), 735 So.2d 17, *writ denied*, 99-1376 (La. 7/2/99), 747 So.2d 22. The general rule is that where an erroneous jury instruction is given that constitutes reversible error, the jury verdict should be set aside, and the appellate court should undertake a de novo review of the record and implement its own judgment based on the evidence. *Id*.

---

[1]*Nicholas* involved, as here, the rejection by the trial court of a proposed jury instruction.

In a jury trial, the judge is not required to give the instructions submitted by either party; however, the trial judge is obligated to give instructions that properly reflect the law applicable in light of the pleadings and facts in each case. *Id.* Adequate instructions are those that fairly and reasonably point out the issues presented by the pleadings and evidence and that provide correct principles of law for the jury's application to the facts. *Id.* Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. *Nicholas*, 765 So.2d at 1023. However, the failure to give an instruction, even if erroneous, is not automatically prejudicial nor does it automatically justify an appellate court's de novo review. An appellate court must go one step further and assess the gravity of the error and consider the entire instructions and circumstances of the case. *Wooley v Lucksinger*, 09-571 (La. 4/1/11), 61 So.3d 507.

IV.

**LAW AND DISCUSSION**

Ms. Sayre contends that the trial court erred in refusing to instruct the jury that, because L'Auberge did not preserve videotape of its inspection of the area or obtain statements from witnesses at the scene, in violation of its own policies, L'Auberge had to overcome an adverse presumption that the statements would not have been favorable to it. Ms. Sayre asserts that L'Auberge's policies prevent injured guests from taking pictures, interviewing witnesses, and getting copies of the accident report and video surveillance, thereby giving L'Auberge complete control of gathering evidence. She further contends that L'Auberge had specific written policies and procedures in place for gathering evidence, and it

6

thereby assumed the sole duty of gathering and preserving the evidence. Ms. Sayre asserts that L'Auberge's employees are trained to control and collect the evidence, and their failure to gather or produce evidence according to their own rules has prejudiced her and prevented her from discovering evidence needed to support specific elements of her claims.

Ms. Sayre asserts that the adverse presumption was created to level the playing field when one party is in exclusive control of the evidence and that failing to instruct the jury on the adverse presumption allows selective preservation of evidence within a party's control to go unchecked. She asserts that because the trial court would not instruct the jury on the adverse presumption, the jury could not render a verdict based upon the law. Her appeal involves the request for a jury charge on the adverse presumption, and she indicates that she is not asserting a cause of action for the tort of spoliation of evidence.

L'Auberge contends that the adverse presumption pertains only to the intentional destruction of evidence that actually existed; that no witness statements were taken; therefore, they did not exist and could not be destroyed. It also contends that enough of the video surveillance was preserved where it shows Ms. Sayre before, during, and after the fall, until she is assisted into Le Café and out of range of the cameras in the corridor. L'Auberge contends that the trial court was correct in refusing to give the jury charge and that the plaintiff has cited no case imposing a duty to collect evidence.

### The Adverse Presumption Doctrine/Remedy

Generally, "[w]here a litigant fails to produce evidence available to him and gives no reasonable explanation, the presumption is that evidence would

have been unfavorable to his cause. The presumption is not applicable where the failure to produce the evidence is explained." *Salone v. Jefferson Parish Dept. of Water*, 94-212, p. 6 (La.App. 5 Cir. 10/12/94), 645 So.2d 747, 750 (quoting *Boh Bros. Const. Co. Inc. v. Luber-Finer Inc.*, 612 So.2d 270, 274 (La.App. 4 Cir.1992)) (citations omitted).

In *Grantham v. Eldorado Resort Casino Shreveport*, 49,474 (La.App. 2 Cir. 11/19/14), 152 So.3d 1028, *writ denied*, 14-2654 (La. 3/6/15), 160 So.3d 1290, the plaintiff argued that the trial court erred in failing to impose an adverse presumption arising from the defendant's failure to preserve at least fifteen minutes of video surveillance footage of the area where the plaintiff fell. On review, the second circuit stated that the "duty to preserve evidence is enforceable if it arose from a statute, contract, special relationship between the parties or an affirmative agreement or undertaking to preserve the evidence." *Id*. at 1031 (quoting *Acadian Gas Pipeline Sys. v. Nunley*, 46,648, p. 14 (La.App. 2 Cir. 11/2/11), 77 So.3d 457, 465, *writ denied*, 11-2680 (La. 2/10/12), 80 So.3d 487).

In *Grantham*, the defendant's risk manager testified that she *preferred* to preserve at least fifteen minutes of surveillance before and after an accident, but only seven seconds had been preserved, depicting only the fall itself. Where testimony indicated that the inexperienced person responsible for the video tape had inadvertently deleted more than he intended to, the second circuit found no abuse of discretion in the trial court's acceptance of the explanation. However, in articulating its reasons for affirming, the *Grantham* court stated:

> It is undisputed that plaintiff did not cite any statute or contract that required Eldorado to preserve the surveillance footage. Rather, plaintiff relies on the testimony of Eldorado's employees that it was the company's usual practice to preserve at least 15-25

minutes of surveillance video surrounding a fall. *Plaintiff did not introduce into the record any written policy to which Eldorado allegedly failed to adhere.*

*Id*. at 1032 (emphasis added).

Similarly, in *Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395 (1st Cir. Mass. 2012), a slip and fall plaintiff asserted that the *presence* of surveillance cameras and the employee's statement that store *policy* was to photograph and preserve evidence, the store's failure to do so was evidence of spoliation. In declining to find spoliation, the court stated:

> We need not reach the novel question of whether a failure to collect evidence may, in certain circumstances, be tantamount to spoliation. The plaintiff grounds this claim on the testimony of the assistant store manager, who stated that, as part of his training, the defendant taught him to compile a full report after an accident, talk to witnesses, take pictures, and secure any relevant videotape. This training, the plaintiff posits, shows that the defendant has a policy of evidence collection. Failure to adhere to that policy, he says, warrants an inference of wrongdoing.
>
> The short answer to the plaintiff's claim is that there is no proof of a particular policy or custom. The manager's testimony only provides evidence that he was trained on best practices. *The testimony cannot reasonably be understood to show the existence of an established store-wide policy or custom requiring employees to take a series of specific steps when an accident occurs.* In these circumstances, the plaintiff has no plausible claim of spoliation.

*Id.* at 400 (emphasis added).

In bright contrast to *Grantham* and *Gomez*, Ms. Sayre did introduce numerous written policies of L'Auberge and showed through testimony that the defendant had not only entrenched across-the-board policies requiring employees to take a series of specific steps when an accident occurred, those policies demanded a permeating and continuing control of the evidence to the exclusion of

9

all others.  The testimony further indicates that the defendant selectively adhered to some of its operating procedures but failed to adhere to others.  The SOP page pertaining to "STANDARD PROCEDURE" for "ALL STAFF" as to "TASK 04: Guest/Employee Accidents Or Injuries" included the following information, though not in the same order as shown:

- ■ Call Security to inform them of incident.
- ■ Offer to call paramedics or if necessary, telephone automatically.
- ■ Obtain the following information from the injured person or any witnesses and/or persons accompanying the injured person:
  1) Name
  2) Address
  3) Telephone (home and work)
  4) Guest, employee or visitor
  5) Description of incident
  6) Witness account of incident
  7) Emergency medical service notified; or if denied, denial is noted.
- ■ Injured party not given a copy of the accident form, only a business card.
- ■ Liability not admitted for any accident or injury.

Additionally, the Security Supervisor/Officer is tasked with a "STEP BY STEP PROCEDURE" for "Completing a Guest Accident Report."  The specific supplies needed are Pen, Notebook, Accident Report and Statement Forms, and Radio.  The "Policy" for the report is to record the accident accurately, preserve facts, bring security and medical-related conditions to the attention of management, aid outside agencies involved with the accident, and provide Risk Management with accurate information.  The "Standard" is that all reports should be accurate, clear, complete, and legible, giving a complete picture of the accident. The procedure contains eighteen steps, including the following:

15.  Witness and home address.  It is important to collect all names of witnesses that were present during the accident and have them write a statement on comments

heard by the victim before, during, or after the accident. Check with Surveillance for available footage.

. . . .

18. Refusal of services should be signed and dated by the victim. (Refused to accept transportation to a medical facility and/or medical services.)

The SOP further instructs Security personnel to report what people say using quotes if possible and to "[r]eport all facts that can be verified by another person observing the same event." It specifically states:

2. Do not rely on memory when doing a report utilize the following tools:

- Personal notebook (recording pertinent information).
- Gather and record all information.
- Obtain written statements.
- If available gather surveillance footage.

Additionally, "All Surveillance Personnel" are tasked with "Monitoring Medical Calls." The "STEP BY STEP PROCEDURE" provides that the "Standard" is to monitor and video record medical calls and emergencies "to assure documentation of *all activity* associated with the incident." There are six enumerated steps, including the following (emphasis added):

3. Communicate via radio and/or land-line with Security any unusual circumstances or other issues *until the incident is resolved*.

. . . .

5. Review video coverage of the occurrence using the SOP for video reviews to assure the video is *complete*.

Security Officer Allison Chretien was the lead officer at the time of Ms. Sayre's accident. She wrote the accident report, but she is not in the video. She was dispatched to Le Café after the fact and took over the investigation from

the other officers who do appear in the video. She was not given any witness or employee statements, and she did not obtain any. Her report attaches two photographs of a floor, but she did not remember who took them or whether she was shown by anyone where the sticky spot on the floor was alleged to be or exactly where Ms. Sayre fell down. She testified that she had no recollection of the event, and her position at the time did not give her access to video surveillance. Yet, her report indicates that she did an inspection, and the floor was free of debris, moisture, and any substance that would cause Ms. Sayre to fall. Ms. Chretien testified as follows when asked if getting witnesses' names was a requirement listed in the hotel's written procedures and required to be followed at all times:

> A      Well, one of the first things is to get with the guest
> who fell, you know, to assist them; and then you try to
> get witnesses, get with the witnesses and get statements
> from them.

Ms. Chretien further testified that this was true for guests and employee witnesses. The injured guest's statement comprises the body of the report, and witness statements are attached. Security also looks for the cause of the accident, inspects the floor and takes photos, while Surveillance follows those actions.

According to Ms. Chretien, all Security personnel stay in touch with Surveillance regarding the movements of Security and document all activity associated with the incident. Security "stay[s] with the incident until the lead supervisor shows up." Guests are not allowed to interview employees who are witnesses, and video files are never released to the guest. Nor can Security reveal the contents of the video to anyone. Guests are not shown a copy of the incident

report nor are they allowed to take photographs. These rules, Ms. Chretien testified are "mandatory."

After viewing the video of Ms. Sayre's accident, Ms. Chretien confirmed that, according to the rules and procedures, the security officers first on the scene should have attempted to obtain witness names and statements from four witnesses shown with Ms. Sayre at one point in the video. She further responded:

> Q And the employees, the other two people up here they don't have any option as to whether they are going to provide that information, correct?
>
> A Yes. Employees must respond -- well, report and fill out the witness statements and incident.
>
> Q And even if it wasn't done there, it could be done later, you could go find them wherever they are working; and they are required as part of their employment to cooperate with your investigation?
>
> A Yes.
>
> Q In the incident report you have, there is no correct – there's no mention of -- in the incident report that you have, there is no mention of any of these four people being witnesses, correct?
>
> A No, only Ms. Sayre.

On cross-examination by counsel for L'Auberge, Ms. Chretien reiterated that she was not depicted in the video, having been dispatched to Le Café, along with EMT Linda Bird, after the incident was over. She specifically testified on direct examination and on cross-examination that she had no independent recollection of the incident. She responded as follows:

> Q When you arrived at the scene, do you know -- well, let me strike that question. You saw the video?
>
> A Yes.
>
> Q Are you seen in the video?
>
> A No.

13

Q      Do you know whether you met with Ms. Sayre inside of Le Cafe?  I mean, I assume you did?

A      Yeah, we did.

Q      Do you know if there were any other witnesses, either employees or patrons present?

A      No.  Not when I was called to the incident when I arrived.

Q      Do you know why there are no witness statements attached to this investigation?

A      No.  No one obtained them; and when I arrived, there were no witnesses.

Q      Had you been aware of any witnesses, would you have tried to obtain statements from them?

A      Yes.

Q      Did you purposefully exclude anything from your report that you thought was relevant?

A      No, I did not.

Thus, there appears to be some recollection of meeting Ms. Sayre in Le Café on the day of the accident.

Kristi Storozyszyn was the manager at Le Café, depicted in the video surveillance sitting on the floor to the right of Ms. Sayre, pointing to a spot on the floor and crawling over to rub the floor with her right hand.  She also helped Ms. Sayre up off the floor, carried her purse, and walked with her into Le Café after the fall.  She also testified that she had no recollection of the incident or why she was rubbing the floor.  Taylor Briggs was the Le Café hostess who ran to call Security when Ms. Sayre fell.  She also had no recollection of the event or of the day of the accident.  Ms. Briggs did not refute Ms. Sayre's testimony that she discussed other accidents and said only that telling a guest about other accidents is not something that she would have done.

The trial court, in declining to give the jury the law on the adverse presumption doctrine, stated that none of Ms. Sayre's cited cases addressed the failure to collect evidence, but rather all cases referred only to evidence that actually existed and was not produced. We must disagree.

In *Salone*, 645 So.2d 747, a pedestrian stepped on a water meter cover which flipped up and injured his leg. The trial court found that the plaintiff failed to prove a defect in the cover or the water department's constructive knowledge of a defect. On appeal, Mr. Salone argued that the trial court erred in both of those factual findings and that the trial court erred in failing to "draw forceful inferences" against the defendant because of its failure to present critical evidence in its control. *Id*. at 748. The Fifth Circuit Court of Appeal discussed the policies of the water department and the testimony of the supervisor responsible for meters:

> The policy of JPDW, when an accident occurs, is to inspect the area, take pictures and make a written report. Mr. Graves was certain that he inspected the scene, and that he had made a report, but a copy of it could not be located. Neither could he locate any photographs which *should have been taken* in conjunction with the report. He also testified that, in the event of an accident, JPDW normally replaces the cover in question, brings that cover to the warehouse and stores it there. He did not know whether this was ever done in this case. He did not know what happened to the (allegedly) defective cover.

*Id*. at 749 (emphasis added).

The fifth circuit found that the defendant had not offered a reasonable explanation as to why the reports, photographs, and meter cover were not available, "*especially in view of [the supervisor's] testimony that it was procedure to store the meter covers and make accident reports.*" *Id*. at 751 (emphasis added).

15

The court found that the adverse presumption could be drawn against the defendant that presentation of the evidence would have been unfavorable to its case.[2]

Similarly, in this case, there was much testimony and evidence adduced regarding the formal policies and procedures for investigating and reporting accidents at L'Auberge. Also similar to *Salone*, parts of L'Auberge's procedures were followed, and parts were not; and, importantly, part of the evidence was collected, and part of it may not have been; in any event, it was not produced. The *Salone* court indicates that photographs *should have been taken* and that the report and the cover were missing. Similarly in this case, witness statements that *should have been taken* according to procedure were either not taken, or not produced. Further, video surveillance was collected, but only part of it was produced.

As pointed out by Ms. Sayre at trial, the accident report of Lead Security Officer Allison Chretien contains assertions that she inspected the area of the fall; and the officer confirmed that it is procedure for Surveillance to follow her during the inspection and capture all activity associated with the event. The surveillance produced does not show the inspection. Thus, there was a discrepancy between the accident report and the video surveillance. Ms. Sayre elicited testimony at trial regarding the deleted surveillance evidence.

Vice-President of Operational Protection for L'Auberge Lake Charles, Darren Hoke, was the Director of Surveillance at the time of the accident. He designed the surveillance system and wrote the SOP. Mr. Hoke testified that there

---

[2]Ultimately, in *Salone*, when the court turned to constructive notice and control by the defendant, the court found that, while the cover was *loose* at the time of the accident, the plaintiff had not shown that the defendant was responsible for that condition as the cover was in a public entry area. Thus, the element of control was missing.

were two types of cameras at L'Auberge, fixed cameras, and pan tilt zoom cameras which can move back and forth, can be controlled by Surveillance agents, and can be set in a home position. Overall, L'Auberge has over 1,400 cameras constantly recording, and video is available for about seven days before it is recorded over. If a section is needed, an agent takes the section out and saves it to a separate part of the system—archives. There are specific procedures for monitoring trip and fall accidents, which are referred to as medical calls. When an agent hears on the Security radio channel that a fall has occurred, he begins to look for the surveillance even before Security gets to the location. If Security gets to it first, that officer radios Surveillance and asks for coverage. At that point the agent uses the pan tilt zoom cameras and covers the incident.

> Q     And then once they obtain coverage, the medical the other rule is that medical calls and emergencies are monitored and video recorded to ensure documentation of all activity associated with the incident; is that correct?
>
> A     Correct.
>
> . . . .
>
> Q     All right. The memo called, "Monitoring medical calls," what it refers to is, it says, okay, once the medical call is over, then you refer to the policy for the video review and use that policy.
>
> A     Sure.
>
> Q     And the policy for video review says that you conduct the review using the following methods 30 minutes of review prior to and after the reported time of the occurrence, correct?
>
> A     Correct.
>
> Q     And that is after everything is done, so they are not having to follow people around anymore, that surveillance agent would then take, you know whatever Camera 1 -- I am just going to call it and review 30 minutes before and 30 minutes after?

17

A	Correct.

Q	And they would do that with I think it's called the – it's not on here, but it's in your documents it's called the concentric method; is that what it's called?

A	Concentric circle method, yes.

Q	That means that you start with the camera at the location and work your way out?

A	Correct.

. . . .

Q	And check different angles because sometimes you have two different cameras like in the case that encompass the same area?

A	Correct.

Q	And then you would go through and review 30 minutes before and then 30 minutes after from each of those cameras. They would then archive – go back to the rule here, document all activity associated with the incident, right?

A	Well, they would archive the information associated with the incident. Yes.

. . . .

Q	Okay. So regardless of whether it stayed in the position that -- we talked about earlier, sometimes they stay in the position they were left in or they might go back to the home position. Regardless if it was left in the position that it was left in or regardless if it reverted back to the home position if Ms. Chretien had come out there within the next 30 minutes and did an inspection and did photos, it would have been captured on that camera.

A	Yes, it would have.

Q	And it was recorded, and it was there for seven days, and L'Auberge had possession of that surveillance?

A	Yes, we would.

Q	Had total control of it.

A	Yes.

18

Q    Okay.  The operatives knew and everybody that knows about surveillance knew that within seven days that it was going to be deleted forever?

A    Correct.

The risk manager at L'Auberge, Jerry Forrester, testified that he was in charge of safety for the guests and employees, workers' compensation, and claims.  He reviews accident reports and surveillance the day after an incident to determine liability.  He confirmed that surveillance of an incident is archived forever, and that he has the ability to ask for additional surveillance before it is overwritten.  Mr. Forrester testified that one of his primary goals is to make certain that the accident report matches the video surveillance.  In this case, however, he did not question the fact that the accident report said an inspection was done, and the surveillance did not show the inspection.

Q    And the data log and the video -- well, let's go back to the report.  The report talks about an inspection, talks about photos, right?

A    Correct.

Q    And you didn't see those on the video anywhere?

A    No, I didn't.

Q    So we knew that there was a video that was not contained in the surveillance that you saw?

A    Of course, that's not what I'm looking for.

Q    I understand.  There is an inconsistency in-between the report and the video that you saw?

A    Correct.

Q    And nobody went down there and said, hey, let me see the rest of the video rolling on that camera in the home position, or wherever that camera got left off so that I can look at that video and see what happens and see if Allison Chretien even knew where to look.

19

A    I am not even investigating Allison Chretien.  I am looking at a fall.

Q    I know.  And you are determining liability for that fall and denying claims for that fall based on an investigation that has some holes in it.

A    I had the information I needed.

Mr. Forrester further testified that he had no knowledge of a legal issue until he received a letter from Ms. Sayre's attorney ten months after the accident.  However, he confirmed that he had sent Ms. Sayre a letter the day after the accident acknowledging the accident and offering her assistance if needed.  He then admitted that he knew at that time from the accident report that Ms. Sayre said there was a sticky substance on the floor, and he knew that she was hurt.  He testified that his "investigation" to determine liability consisted of viewing the surveillance and reading the reports.  He denied talking to the Le Café hostess or the Le Café manager, while admitting that the hostess was likely a material witness.  Mr. Forrester confirmed that he responded to Ms. Sayre's attorney's letter, which was actually sent eight months after the accident.  He responded that L'Auberge had no liability for the accident, and he enclosed copies of Ms. Sayre's statement and the form declining ambulance transport.  He then stated, "Due to company policy, we cannot provide copies of any other statements, reports, photos, or surveillance at this time."  When questioned about "other statements," he said there were none.

The above testimony indicates that L'Auberge actually had possession of video surveillance that it deleted.  The above evidence also demonstrates not only complete control of the evidence but also an intent to maintain control to the exclusion of all others.  It is difficult to view this testimony regarding the pervasive

policies in place, and the manner in which only certain procedures were followed, without seeing a veiled intent to cherrypick only the procedures that give the defendant standing to assert an "*empty head*" and "*pure heart*" defense. *See Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 438 (S.D.N.Y. 2010).

Federal cases discuss the adverse inference as one sanction for spoliation of evidence and in conjunction with that doctrine. In those cases, the adverse inference instruction requires an obligation to preserve evidence, a culpable state of mind, and relevance. *See In re Semrow*, 2011 WL 1304448, at *3 (D. Conn. 3/31/11) (unpublished opinion). The culpable state of mind can include negligence, which Louisiana has rejected. More specifically, in a case involving a third party's negligent spoliation of evidence, the Louisiana Supreme Court recently decided definitively that in Louisiana, neither "legislative will" nor "policy considerations" support "recognition of the tort of *negligent* spoliation" of evidence. *Reynolds v. Bordelon*, 14-2362, p. 13 ( La. 6/30/15), 172 So.3d 589, 600 (emphasis added). However, in concluding its comprehensive analysis, the *Reynolds* court explained that part of its logic was based upon the existence of *alternative remedies* for plaintiffs in Louisiana. In discussing those alternative remedies, the court stated: "*Discovery sanctions and criminal sanctions are available for first-party spoliators. Additionally, Louisiana recognizes the adverse presumption against litigants who had access to evidence and did not make it available or destroyed it.*" *Id.* (emphasis added).

Federal cases are particularly instructive in explaining the evidentiary and policy rationales for allowing the adverse inference or presumption.

This adverse inference rule is supported by evidentiary, prophylactic, punitive, and remedial rationales. The evidentiary rationale derives from the common sense notion that a party's destruction of evidence which it has reason to believe may be used against it in litigation suggests that the evidence was harmful to the party responsible for its destruction. The prophylactic and punitive rationales are based on the equally commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence will deter such destruction, and will properly "plac[e] the risk of an erroneous judgment on the party that wrongfully created the risk." *Nation–Wide Check*, 692 F.2d at 218. Finally, courts have recognized a remedial rationale for the adverse inference—namely, that an adverse inference should serve the function, insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party. *See Skeete v. McKinsey & Co.*, No. 91 Civ. 8093, 1993 WL 256659, at \*5 (S.D.N.Y. July 7, 1993); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 74 (S.D.N.Y.1991).

*Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

In *Porter v. Irvin's Interstate Brick & Block Co., Inc.*, 691 N.E.2d

1363, 1364-65 (Ind.App. 1998), the court stated:

In Indiana, the exclusive possession of facts or evidence by a party, coupled with the suppression of the facts or evidence by that party, may result in an inference that the production of the evidence would be against the interest of the party which suppresses it. *Westervelt v. National Manufacturing Co.*, 33 Ind.App. 18, 69 N.E. 169, 172 (1903). "While this rule will not be carried to the extent of relieving a party of the burden of proving his case, it may be considered as a circumstance in drawing reasonable inferences from the facts established." *Great American Tea Co. v. Van Buren*, 218 Ind. 462, 33 N.E.2d 580, 581 (Ind.1941). The rule not only applies when a party actively endeavors to prevent disclosure of facts, but also when the party "merely fails to produce available evidence." *Morris v. Buchanan*, 220 Ind. 510, 44 N.E.2d 166, 169 (1942).

"The obligation to preserve evidence arises when the party has notice

that the evidence is relevant to litigation or when a party should have known that

the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). *See also Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.") and *Kronisch*, 150 F.3d at 126.

In *Fischer v. Travelers Ins. Co.*, 429 So.2d 538 (La.App. 4 Cir. 1983), involving impairment of a civil claim, an officer at the scene of an accident failed to file an accident report in violation of a statute requiring such filing. When the court addressed whether the violation was a cause-in-fact of the plaintiff's damages from the accident, the court stated: "Certainly the officer's negligence did not cause the physical injuries suffered by plaintiff. It did, however, cause him to lose the opportunity to pursue the claim against the other driver . . . ." *Id*. at 540.

In *Guillory v. Dillard's Department Store, Inc.*, 00-190 (La.App. 3 Cir. 10/11/00), 777 So.2d 1, this court provided a historical backdrop for the adverse presumption, spoliation, and impairment of a civil claim, indicating that content of the claim is more important than the label:

> Prior to being discussed as a tort, the term "spoliation of evidence" appeared in our jurisprudence along with the evidentiary theory of adverse presumption. In those cases where it was proven that a party had destroyed, altered, concealed, or failed to produce evidence relevant to the pending civil claim, and they could not reasonably explain their actions, Louisiana courts have sanctioned the party by instructing the jury of the adverse presumption that had the evidence in question been presented, it would be unfavorable to the party spoliator. Although the adverse presumption rule is still viable, the present inquiry is whether a plaintiff can seek damages in tort, from a person who allegedly destroys or conceals

23

evidence material to a potential or pending lawsuit and, if so, under what circumstances that person will be held liable.

First, we note that our jurisprudence has recognized a person's right to assert a similar cause of action for the tort of impairment of a civil claim. Although the claims may be separate, both causes of action are premised on the right of a plaintiff to be free from interference in pursuing and/or proving his or her lawsuit. In some cases, when a plaintiff claims that the ability to institute or prove a civil claim has been impaired due to . . . spoliation of evidence by another, courts have addressed the causes of action for impairment of a civil claim and spoliation of evidence as one. Thus, we believe that it is of little importance here, to determine an exact title to label plaintiff's claim for damages resulting from the acts alleged; for when a plaintiff alleges sufficient facts which indicate that he or she has suffered damages caused by another's fault, that plaintiff has asserted a claim actionable under Louisiana tort law.

*Guillory*, 777 So.2d at 3-4 (citations omitted).

In *Bethea v. Modern Biomedical Services, Inc.*, 97-332, pp. 10-11 (La.App. 3 Cir. 11/19/97), 704 So.2d 1227, 1233, *writs denied*, 97-3169, 97-3170 (La. 2/13/98), 709 So.2d 760, 761, we discussed the evidentiary duty:

La.Civ.Code art. 2315 states in pertinent part that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." This article broadly sets forth the terms by which society's conduct is governed, i.e., that each individual is accountable for his or her actions as they affect fellow members of society.

La.Civ.Code art. 2315 speaks in general terms in order to ensure that the specific wrongs not foreseeable by the drafters would be included, for "[a]s the drafters ... realized, no one could foresee all the possible types of civil injuries and accidents that might befall people." Shael Herman, *The Louisiana Civil Code: A European Legacy for the United States*, 52 (1993). Article 2315 does not limit the notion of fault. *Ardoin v. Hartford Accident & Indem. Co.*, 360 So.2d 1331 (La.1978). The framers of our civil code viewed fault broadly,

24

> as a breach of a preexisting obligation, for which the law orders reparation, when it causes damage to another, and they left it to the court to determine in each case the existence of an anterior obligation which would make an act constitute fault. 2M. Planiol, Treatise on the Civil Law, Part 1 §§ 863-865 (1959).
>
> *Pitre v. Opelousas Gen. Hosp.*, 530 So.2d 1151, 1156 (La.1988).
>
> Although there is no statutory duty imposed on the defendants in this case to preserve the evidence and avoid hindering plaintiffs' claim, we find a duty exists under La.Civ.Code art. 2315. The absence of a statutory duty is not tantamount to no duty. The parameters of what constitutes fault in Louisiana reach far and wide in order to hold people accountable for their harmful actions regardless of whether or not their actions are covered by a statutory provision. Intentionally hindering a plaintiff's civil claim when there is no statutory duty to prevent this action is just as violative of our civilian notion of justice and fair play as when a statutory duty is imposed. For purposes of this issue, this court fails to see the benefit of making a distinction between a specific statutory duty and the far-reaching duty La.Civ.Code art. 2315 imposes. Based on the pleadings, we find that a viable cause of action for impairment of a civil claim and spoliation of evidence stands against the defendants in this case. The ruling of the trial judge on this issue is affirmed.

Thus, La.Civ.Code art. 2315 encompasses the torts of impairment of a civil claim and intentional spoliation of evidence. *See also White v. Monsanto*, 585 So.2d 1205 (La.1991), where the Louisiana Supreme Court broadly construed Article 2315 and recognized the tort of intentional infliction of emotional distress.

The adverse presumption is a sanction for spoliation, but it also stands on its own as a doctrine and an alternative remedy to restore footing to the party who has unfairly borne the risk of missing evidence and an erroneous judgment. Here, L'Auberge had complete control of the evidence and a policy in place to gather and maintain control of the evidence, to the exclusion of all others,

essentially creating a vault that admits no light.  Under such circumstances, it assumed the sole duty to gather and preserve evidence.  This duty combined with the duty created by its knowledge of potential litigation, its breach of those duties, and the duty under Article 2315 to repair the harm it has caused, entitle Ms. Sayre to the adverse presumption that the missing evidence would have been unfavorable to L'Auberge.

***Jury Charges***

> Pursuant to La.Code Civ.P. art. 1792 (emphasis added):
>
> A.  At any time *during the trial*, the court *may* instruct the jury on the law applicable to any issue in the case.
>
> B.  *After the trial of the case* and the presentation of all the evidence and arguments, the court *shall* instruct the jurors on the law applicable to the cause submitted to them.  The court *shall reduce such instructions to writing*.  The court *shall* further instruct the jury that it may take with it or have sent to it a written copy of all instructions and charges and any object or document received in evidence when a physical examination thereof is required to enable the jury to reach its verdict.

Accordingly, trial courts are required to "instruct jurors on the law applicable to the cause submitted to them."  La.Code Civ.P. art. 1792(B).  Here, the missing evidence was heavily explored at trial, but the jury was not instructed how to evaluate that issue.  Adequate jury instructions "fairly and reasonably point out the issues and ... provide correct principles of law for the jury to apply to those issues." *Adams v. Rhodia, Inc.*, 07-2110, p. 6 (La. 5/21/08), 983 So.2d 798, 804. "If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error." *Id.*  "[W]hen a jury is erroneously instructed and the error

probably contributed to the verdict, an appellate court must set aside the verdict." *Nicholas*, 765 So.2d at 1023.

Federal decisions illustrate how wide a range the trial court has in fashioning a jury charge for deletion, destruction, or suppression of evidence depending upon a party's level of culpability. Many courts leave it to the jury to decide whether to apply the inference. For example, in *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004), the court gave the following instruction:

> If you find that UBS could have produced this evidence, and that the evidence was within its control, and that the evidence would have been material in deciding facts in dispute in this case, you are permitted, but not required, to infer that the evidence would have been unfavorable to UBS.

*Id*. at 440.

Thus, courts can formulate various forms of adverse inference instructions ranging in degrees of harshness, which we find instructive. In any event, courts should be ever mindful that:

> Litigation is not a game. It is the time-honored method of seeking the truth, finding the truth, and doing justice. When a corporation and its counsel refuse to produce directly relevant information an opposing party is entitled to receive, they have abandoned these basic principles in favor of their own interests.

*Haeger v. Goodyear Tire & Rubber Co*., 906 F. Supp.2d 938, 941 (D. Ariz. 2012).

We find that the actions of L'Auberge under the facts of this case impermissibly impaired Ms. Sayre's ability to present her claims to the jury; that the actions of the defendant created, and exploited to fruition, the risk of an erroneous judgment; and that the risk should have been placed on the party who created it—by way of an appropriate jury charge on the adverse presumption or inference. The trial court did not have to use the jury charge suggested by Ms.

27

Sayre, though it was perhaps the least burdensome to the defendant, as it would have allowed the jury to decide. We find that the failure to instruct the jury in this case prevented the jury from rendering a verdict based upon the applicable law. The depth and extent of L'Auberge's actions and inactions as discussed above are sufficiently severe to have warranted an adverse presumption jury instruction. The refusal of the trial court to instruct the jury on this presumption was of such gravity so as to deprive the jury of its factfinding obligation. Thus, the verdict must be set aside.

### Remand or De Novo Review

After finding an error in the trial court, an appellate court has two potential courses to follow: (1) a remand to the district court, or (2) the rendering of a decision following a de novo review of the record. *Gonzales v. Xerox Corp.*, 254 La. 182, 320 So.2d 163 (1975), discusses and reaffirms the constitutional power of an appellate court to decide a case, de novo, on the record when the jury verdict must be set aside and given no weight because of the gravity of the trial court error. This power is consistent with appellate jurisdiction of both law and facts. *Id.*; *See also* La.Const. art. 5, §§ 5 & 10.

Citing *Gonzales*, the supreme court has explained: "An appellate court, when it believes that errors committed at trial influenced the jury verdict, must undertake an independent evaluation of the facts and adjudicate the controversy before it." *Suhor v. Gusse*, 388 So.2d 755, 758 (La.1980) (citations omitted). Here, we find that the record, consisting of three volumes of pleadings and three volumes of exhibits, is complete. Accordingly, we will conduct a de novo review and render a decision on the merits.

28

*Merchant Liability*

Louisiana Revised Statutes 9:2800.6 governs merchant liability. It provides that "[a] merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition," including "a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage." La.R.S. 9:2800.6(A). A plaintiff such as Ms. Sayre must show that (1) the condition of the floor presented an unreasonable risk of harm, (2) the defendant either created or had actual or constructive notice of the condition prior to her fall, and (3) the defendant failed to exercise reasonable care. La.R.S. 9:2800.6(B). Paragraph C provides the following definition:

> "Constructive notice" means the claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.

La.R.S. 9:2800.6(C)(1).

Here, the evidence that is available supports Ms. Sayre's testimony that an unreasonable risk of harm existed in the condition of the floor. The approximately four minutes of video that was preserved and entered into evidence shows seven witnesses hurrying to assist Ms. Sayre when she fell and four additional people involved in the scene for a while. A spot on the floor is pointed to by four different people, the Le Café manager, the man in a white tee shirt and white baseball cap, the blonde lady, and the first Security employee pointing it out to the second Security employee at the scene. It also shows the Le Café manager

sitting on the floor to the right of Ms. Sayre and then crawling over to the spot and rubbing it with her right hand. The video itself corroborates Ms. Sayre's testimony that there was a clear sticky substance on the floor that caused her to trip and fall in the corridor outside Le Café.

L'Auberge violated its own policies and procedures by failing to attach witness and employee statements to its accident report. The blonde woman who pointed out the spot also describes the fall, using her outstretched hands, to two different people while she is moving around the scene. She certainly appeared in the video like someone who wanted to be helpful. Yet, no statement from her or any of the many people at the scene was attached to the accident report. Additionally, the hotel's own rules required it to carve out and review video of the location thirty minutes before the accident and thirty minutes after the accident.

The saved video of the fall, and the witnesses who came to help, lasts a little over four minutes. The surveillance log was open for over nineteen minutes. L'Auberge's SOP requires reviewing thirty minutes before and thirty minutes after the incident to get all activity associated with the incident. Ultimately, everything was deleted except the four minutes entered into evidence. The video does not show the inspection that Security Officer Chretien attested to doing in her report, though it was procedure to video the inspection as well. When the adverse presumption is applied to the missing evidence and factored in with the positive evidence in the video, the existence of the unreasonable risk of harm is established.

With regard to constructive notice, Ms. Sayre testified that the Le Café hostess told her that she was the fourth person to fall in front of Le Café, indicating knowledge that is attributed to the hotel. The hostess testified that she

30

had no recollection of the day and did not refute Ms. Sayre's testimony. No one refuted it. L'Auberge did not call a single witness of its own at trial. The hostess's station was shown to be in close proximity to the fall such that she likely saw the fall, as the video depicts her practically jumping over Ms. Sayre when she ran to call Security. The hostess testified that she would have been working the 4:00 shift that day. Thus, she would have been at her station for hours before the 9:30 p.m. accident. Ms. Sayre was a guest in the hotel and unfamiliar with Le Café and its employees. She testified that the lady on her left in the video, as Ms. Sayre lay in the corridor, is the one who told her about the previous incidents. That person was the hostess, Taylor Briggs. This all occurred in the same four minutes shown on the video with the other witnesses pointing to the spot on the floor. We find that the hotel had constructive notice of the sticky floor.

There was abundant testimony at trial, along with numerous written policies and procedures, showing that L'Auberge employees are taught that if one sees a condition, he or she owns it; i.e., it is the responsibility of the person who finds a problem to rectify the problem or call someone who can rectify it. Where the hostess knew about other stumbles or trips or slips in that area before Ms. Sayre's fall, she should have acted to remedy that condition. Since the substance was still on the floor, as shown by all of the pointing witnesses in the video, L'Auberge, who is responsible for the actions of its employees, did not act reasonably to remedy the condition on the floor.

The remaining element is damages. It is not disputed that Ms. Sayre sustained three fractured ribs in the fall. Further, as in *Fischer*, 429 So.2d 538, discussed above, the fact that L'Auberge and Acadian EMT Linda Bird provided an ice pack and offered an ambulance indicates that they knew Ms. Sayre incurred

31

injuries from the fall. In fact, Ms. Sayre admitted those injuries, and they were listed in the accident report. While L'Auberge argues that the rotator cuff tear and its expenses and surgery were not related because she did not seek medical care for nine months for the tear, her orthopedist related the tear to the fall at L'Auberge.

More specifically, Dr. A. J. Binder, a Tulane-trained orthopedist who was accepted at trial as an expert in shoulder injuries and repairs, testified that the near full-thickness tear that developed in Ms. Sayre's rotator cuff was consistent with the frontward fall with her arms pulled upward. He opined that she likely had a small fraying in the rotator cuff from normal wear and tear that was traumatized in the fall and began tearing. He stated that the tear, once started, then continues, and it happens slowly; inflammation in the fluid and joint causes the pain to increase. The rotator cuff connects the muscle to the bone, and as the tendon pulls away, the muscle begins to shrink, and the process can take from two to twenty-four months for permanent atrophy.

After examining Ms. Sayre in September of 2010, Dr. Binder suspected a torn rotator cuff, which he later confirmed with an MRI. Ultimately, he performed surgery, during which he had to pull the remaining tendon off the bone and re-attach it. He prescribed physical therapy which Ms. Sayre attended from December 2010 until April 2011. Several months later, Ms. Sayre returned with increased pain in her arm. She had developed a bicep condition and increased arm pain related to rotator cuff tears. He has treated her consistently with cortisone injections and testified that she will likely need scope surgery to release the bicep. As a specialist in sports medicine, Dr. Binder discussed the tendon tear of professional football player Brett Favre that hurt his record with the New York Jets

32

and the subsequent biceps release surgery that allowed him to play well with the Minnesota Vikings and go to the playoffs.

While Ms. Sayre had some residual shoulder pain prior to her fall at L'Auberge, Dr. Binder clearly differentiated a prior shoulder surgery in 2000, with Dr. Charles Johnson, from the rotator cuff injury at L'Auberge in 2009. The prior surgery involved an impingement that did not involve the rotator cuff, and the medical records from that earlier period indicated no rotator cuff pathology. Moreover, the first surgery benefited the rotator cuff by creating more clearance.

As previously indicated, L'Auberge did not call any witness of its own. Thus, there was no evidence contrary to Dr. Binder's testimony. Accordingly, pursuant to our de novo review, Ms. Sayre has proved all elements of her negligence suit against L'Auberge. We next turn to quantum.

*Quantum*

Ms. Sayre's past medical expenses total $46,026.54. Counsel for L'Auberge told the jury that this was the amount of her expenses if the shoulder injury was included in an award.[3] Ms. Sayre has had to adjust her daily activities, shifting more responsibility to her husband. They have had to stock items on lower shelves because reaching is painful. She cannot lift or hold or walk her dogs as before. She has to take them out one at a time and repeat daily activities in small increments to get things done. Simple grooming is painful; even washing and drying her hair is difficult. She also had continued soreness in her ribs at the time of trial. Ms. Sayre cites various cases and suggests that her general damages for pain and suffering and loss of enjoyment of life range from $150,000.00 to

---

[3]L'Auberge sought to have the jury include no more than the rib injuries for under $2,000.00.

$170,000.00. In *Saucier v. Players Lake Charles, LLC*, 99-1196, p. 12 (La.App. 3 Cir. 12/22/99), 751 So.2d 312, 320, the court stated:

> *Montgomery v. Opelousas Gen. Hosp.*, 546 So.2d 621 (La.App. 3 Cir.), *writ denied*, 551 So.2d 630 (La.1989), defines and sets forth items to consider in assessing general damages. *Montgomery* states: "[g]eneral damages are those which may not be fixed with pecuniary exactitude; they instead involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification, or physical enjoyment, or other losses of life or lifestyle which cannot be definitively measured in monetary terms." *Id.* at 623. Additionally, in *Savelle v. Heilbrunn*, 552 So.2d 52, 59 (La.App. 3 Cir.1989), *writ denied*, 556 So.2d 1267 (La.1990), this court stated that "[i]n making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Rather, we set the award in an amount which is just compensation for the damages revealed by the record."

Because the jury was foreclosed from reaching the issue of damages because of its finding of lack of fault, we may determine an award that is fair and just based on the record before us. *Ryan v. Zurich American Ins. Co.*, 07-2312 (La. 7/1/08), 988 So.2d 214. We conclude that an award of $170,000.00 in general damages is warranted.

## V.

## CONCLUSION

Based upon the foregoing, the jury verdict is set aside and judgment is entered in favor of Ms. Sayre and against the defendants, PNK (Lake Charles), LLC D/B/A L'Auberge Du Lac and Zurich American Insurance Company in the amount of $216,026.54. Costs of this appeal are assessed to the defendants.

**REVERSED AND RENDERED**.